In re Barth, 26 N. M. 93.

(No. 2335.    Jan. 1, 1920.)

(Rehearing Denied May 12, 1920.)

## In re BARTH.

### SYLLABUS BY THE COURT.

1.   Where an attorney at law, who is representing a beneficiary under a will, induces his client to assign to him an interest in such legacy, under an agreement on his part to account for the same as soon as it is collected, and thereafter collects such interest so assigned, and appropriates the same to his own use, and, fails and refuses to account for the same, such attorney is guilty of unprofessional conduct, which requires his disbarment.                                    P. 112

2.   Where an attorney at law collects money for his client, and deceives such client as to the fact of having collected the same, and appropriates the same to his own use, he is guilty of unprofessional conduct which requires his disbarment. No circumstance in which an attorney may be placed will warrant him in appropriating to his personal use the funds of his client, or justify him in falsely stating that such funds are not in his hands.                                              P. 112

3.   An attorney has no right to deal with his client in regard to a matter which has been placed in his hands for attention, unless the client is fully advised as to all his attorney knows in regard to the transaction.          P. 125

Original proceeding on an accusation against Isaac Barth for disbarment, filed by the Attorney General on recommendation of the State Board of Bar Examiners. Respondent disbarred.

HARRY S. BOWMAN, Assistant Attorney General, for the State.

The fact that the larger part of the personal property contained in the house was community property was certainly well known to respondent as appears from certain letters from him to Mrs. Andros and Mr. McMillen, all of which are in evidence. His advice, therefore, to his client to strip the house of furniture, fixtures, coal, etc., when he knew that it belonged to the Flournoy estate and to the possession of the executrix could not be justified upon any ground.

In re Hittson, 20 N. M. 319; In re Moore, 20 N. M. 312.

An assignment of bills payable or other personal property as collateral security does not warrant the assignee in appropriating such property to his own personal use.

31 Cyc. 836, and cases cited.

The Davis transaction created a fiduciary relation, and Davis was entitled to be truthfully informed as to the collection of the funds in which he had a vital interest, and Mr. Barth had no right to appropriate them to his own use even though he was not attorney for Davis.

Delano's case, 58 N. H. 5, 42 Am. Rep. 155; In re Haymond, 53 Pac. 899, 121 Cal. 385; In re Smith, 85

Pac. 584, 73 Kan. 743.

By admitting an attorney to its bar the court presents him to the public as worthy of its confidence in all of his professional duties and relations. If afterwards it comes to the knowledge of the court that he has become unworthy, it is its duty to withdraw that endorsement and thereby cease to hold him out to the public as worthy of professional employment.

In re Davies, 93 P. St. 116, 39 Am. Rep. 729, 730; Serfass's case, 116 Pa. 455, 9 Atl. 674; In re Ramsey (S. D.) 123 N. W. 726; In re Elliott, 18 S. D. 264, 100 N. W. 431; In re McDermit, (N. J.) 63 N. J. L. 476, 43 Atl. 685, 691.

Unfitness as ground for disbarment.

6 C. J. 686.

Unfaithfulness.

6 C. J. 589.

Appropriation of funds.

People v. Betts, (Colo.) 58 Pac. 1091; In re Tread-well, 67 Cal. 353, 7 Pac. 724; Baker v. State, 90 Ga. 153, 15 S. E. 788; Slemmer v. Writ, 54 Iowa 164, 6 N. W. 181; State v. Cadwell, 16 Mont. 119, 40 Pac. 176; State v. Hand, 9 Ohio 42; In re O . . . . . ., 73 Wis. 602, 42 N. W. 221; People v. Hays, 62 Pac. 832, 28 Colo. 82; People v. Waldron, 64 Pac. 186, 28 Colo. 249; People v. Mead, 68 Pac. 241, 29 Colo. 344; In re Bearnes, 92 N. W. 466, 88 Minn. 31; In re Z . . . . . ., 89 Mo. App. 426; In re Weed, 68 Pac. 1115, 26 Mont. 507; In re McDermit, 43 Atl. 685, 63 N. J. Law 18; In re Simpson, 83 N. W. 541, 9 N. D. 379.

Power to disbar.

Sec. 361, Code 1915; 6 C. J. 580, § 27 and notes, and 584 and notes; State v. Raynolds, 22 N. M. 1; State v. Martin, 45 Wash. 76; 6 C. J. 601, § 62; People v. Chamberlain, 242 Ill. 260, 89 N. E. 994; In re Davies, 93 Pa. 116, 122, 39 Am. Rep. 729; In re Ramsey, 24 S. D. 266, 123 N. W. 726.

PATTON & HATCH, of Clovis, for respondent.

We think the allegation of intent and motive is as important in this character of case as criminal intent in a criminal case.

Zachery v. State, 53 Fla. 94, 43 So. 925.

Attorney may legally buy client's property.

In re Renehan, 19 N. M. 640.

OPINION OF THE COURT.

ROBERTS, J. This is an original proceeding, on an accusation against Isaac Barth for disbarment, filed

by the Attorney General of the state, in accordance with the recommendation of the State Board of Bar Examiners, under and pursuant to the provisions of chapter 8, Code 1915. The hearing was had upon the first amended accusation and the answer thereto. The court heard all the witnesses, except Sam Davis, a witness for the state, whose testimony was given by deposition. The said amended accusation contained nine counts, each charging said Barth with unprofessional conduct, subjecting him to disbarment or discipline, if the same had been established to the satisfaction of the court, by the evidence adduced. It will probably lead to a better understanding of the various counts of the accusation and the facts relating to the same if they are considered in connection with the evidence adduced.

First. It was charged that respondent, on the 14th day of August, 1918, caused to be printed in the Albuquerque Morning Journal, a daily newspaper published in Albuquerque, an untrue account of a certain judicial proceeding in which Jeanette W. Flournoy, widow of M. W. Flournoy, deceased, late of the city of Albuquerque, was seeking to establish her right to certain community property. It was charged that respondent was responsible for the publication of the article; that such article contained an untrue and incorrect version of the result of such proceeding, and was designed to advertise the said respondent as an attorney at law, and to establish his prowess as an attorney in litigation concerning estates, and to further establish the said respondent as the champion of women, and especially of widows, both in the Legislature, in which respondent was a state senator, and in the courts. The article was calculated to create such a reputation for the respondent, but the proof shows that he had nothing to do with its publication. There was a finding of not guilty upon this count of the accusation at the conclusion of the evidence on behalf of the state.

Second. The second count of the accusation charges the respondent with advising his client, Mrs. Jeanette

W. Flournoy, to retain possession of certain property belonging to the estate of her deceased husband, M. W. Flournoy, for the purpose of gaining an advantage for his client, well knowing at the time that the executrix of the estate was entitled to the possession thereof.

The facts under this count, briefly stated, are as follows:

Respondent represented Mrs. Jeanette W. Flournoy, as her attorney, in the matter of the settlement of the estate of her deceased husband, M. W. Flournoy. Said Flournoy died on the 25th day of September, 1915, leaving Mrs. Jeanette W. Flournoy as his widow, by a second marriage. Nell E. Flournoy Andros, a daughter by his first marriage, was named as executrix of his will by the testator. He had been married to his last wife but three or four years at the time of his death. He was possessed of property amounting to between $300,000 and $400,000 at the time of his death. By his will he gave his last wife $20,000, and provided that this bequest should be in lieu of all claims against his estate. A bitter controversy arose between the widow and the daughter over the settlement of the estate. The daughter, as executrix named in the will, was insisting that the legacy was exclusive, and that the widow had no further claim of any kind or character against the estate. The widow employed respondent to represent her interests in the matter, and, acting upon his advice, she refused to surrender possession of certain articles in the house, and claimed certain other articles of furniture as exempt; she also laid claim to certain property as her separate property. Respondent was compelled to ask the probate court to require the executrix to list the property in the house so that the widow could claim her exemption. The executrix, or her attorney, served written notice on the widow that the rent on the house in which she was living would be doubled after a certain date. This house did not belong Mr. Flournoy personally, but to a corporation in which he owned most of the stock. The evident purpose of the notice was to force

the widow out of the house. She decided to move rather than pay the rent demanded, and respondent advised her to remove the furniture. She did so, and later, based on such action, the executrix secured a judgment against the widow for approximately $3,000. It was disastrous advice, it must be conceded, but respondent has satisfied the court that in giving the widow the advice he was acting for what he believed to be her best interests. He was mistaken, but many lawyers err in advising clients, and for this they are not to be condemned or disbarred, if they are acting in good faith. As to this count there will be a finding of not guilty.

Third. The facts under the third, fourth, and seventh counts of the accusation are so related that it will avoid repetition and lead to a better understanding if these counts are considered together. First we will state the charge under each count, and then consider the facts. By the third count it was charged that respondent induced Mrs. Jeanette W. Flournoy, his client, to assign to him the sum of $5,000, due her from the estate of her deceased husband, and, after collecting the same, that he refused to account to her for the same, or to pay such money over to her.

The fourth count charges that respondent failed to pay over to Mrs. Flournoy, his client, certain other moneys which he had collected, belonging to her, and that he appropriated the same to his own use; that his client was compelled to employ an attorney to attempt to secure from him a settlement and the payment of the moneys due her.

The seventh count charges that respondent represented Sam Davis, assignee of Mrs. Flournoy, as attorney; that he collected for Davis, as such attorney, the sum of $5,000 from the estate of M. W. Flournoy on the 15th day of October, 1917; that he appropriated the same to his own personal use, and falsely advised his client that he had not been able to collect the money due under the assignment.

We will next consider the evidence, pro and con, as to these counts, and set forth the facts which we find to be established thereby. As to many of the facts there is no conflict in the evidence.

M. W. Flournoy, in his lifetime, was a prominent banker of Albuquerque, N. M., and was possessed of considerable property. He married early in life, and to this union one child, a daughter, Nell E. Flournoy, was born. His first wife died some years prior to 1912, and his daughter married Mr. Andros, and resided in Illinois. About the year 1911 or 1912 Flournoy married Mrs. Jeanette W. Welvert, and lived with her until the date of his death in August or September, 1915. He was possessed of considerable property when he married Mrs. Welvert, and accumulated considerable property after such marriage. His affairs were greatly involved, as he was financially interested in many different enterprises. He left a will, in which he gave his widow $20,-000, and the bequest was stated to be "in lieu of all claims against my estate." The residue of his estate was given to the daughter, Nell E. Flournoy Andros, and she was named as executrix in the will. It was further provided by the will that if she did not qualify that the First Savings Bank should be named. Upon the death of Mr. Flournoy the will was offered for probate, and the probate court was asked to appoint Mrs. Andros as executrix.

The widow, Mrs. Flournoy, had had very little business experience. Friends advised her to employ respondent to represent her in the matter of the settlement of the estate. She sought to retain him, and found, upon inquiry at his office, that he was absent from the city. She, however, waited until his return, upon which he was advised by some one in the office that Mrs. Flournoy desired to see him. He went to her house, and she told him of the provisions of the will, and asked if she was entitled to any further interest in the estate, and upon what terms she could secure his services in representing her in the matter. He advised her that she was entitled

to· a one-half interest in the community property; that
she possibly would be entitled to the proceeds of the life
insurance; that she was entitled to certain exemptions
and to a widow's allowance. The result of the confer-
ence was that a written contract was entered into be-
tween respondent and the widow, which, in so far as
material, reads as follows:

"Second. That the said party of the second part shall
prosecute each and every claim that the said party of the first
part may legally have against the estate of her husband, the
said M. W. Flournoy, deceased, on or account of any com-
munity property or exemption that the said party of the first
part may be lawfully entitled to receive; and that the party
of the second part in addition thereto shall prosecute a suit
in whatever court necessary to make the estate· of M. W.
Flournoy, deceased, pay two (2) certain notes signed by the
party of the first part, and delivered to the First Savings Bank
& Trust Company, of Albuquerque, New Mexico, which two
(2) said notes amount to about sixteen hundred ($1,600.00)
dollars; and will in all things and wherever necessary do each
and everything necessary in and about the prosecution and de-
fense of such matters or things connected with the interests
of the said party of the first part in said estate, and in any
court or courts that may be necessary so to do.

"Third. That the said party of the first part, agrees to pay
to the said party of the second part, his heirs or assigns, as
full compensation for all his services in each and all of the
matters herein enumerated, the sum of two hundred ($200.00)
dollars, as aforesaid, and in addition thereto, twenty (20%)
per cent. of the value of everything recovered or saved by
the said party of the second part out of the said estate of
M. W. Flournoy, deceased; it is expressly understood, how-
ever, that the said attorney shall receive no percentage on the
twenty thousand dollars, ($20,000.00) or any part thereof,
left by the will of the said M. W. Flournoy, deceased, to the
said party of the first part, or for the recovery of the prop-
erty conceded by the executrix to be the separate property of
the said party of the first part.

· "Fourth. It is expressly understood that other than the
two hundred ($200.00) dollars hereinbefore mentioned paid
to the second party, as a retainer, the said party of the second
part shall receive no compensation whatsoever for his serv-
ices as the attorney for the party of the first.part, and other
than the twenty (20%) per cent. of the value of the amount
saved or recovered, as hereinbefore stated."

Immediately litigation started between the widow and
the executrix. First there was a successful attempt to

prevent the appointment of the daughter as executrix because she was not a resident of the state. The daughter, however, moved to the state and was appointed. There were various suits between the executrix and the widow, some covered by the contract above set forth, and others outside the terms of employment. Respondent was prosecuting a suit by the widow to establish her right to one-half of the community property. He had succeeded, after protracted litigation, in securing a widow's allowance of $200 per month for six months. He had secured for her certain separate property, not of great value, however. The executrix had recovered a judgment against the widow of something like $3,000 for conversion of the furniture. Respondent attempted to defeat the collection of certain notes signed by the widow, the proceeds of which were used to purchase furniture for the house, or rather to force the payment thereof by the executrix. In this he failed.

Mrs. Flournoy was a very poor business woman. The legacy left her was to be paid at once, or at the end of two years, at the option of the executrix. If delay was had in its payment, the widow was to have interest on the legacy at the rate of 8 per cent. per annum. The executrix would not pay the legacy. Mrs. Flournoy had no money, so she assigned the amount of $4,000 to the First National Bank shortly after the death of her husband, as security for a loan. This money she soon dissipated, and the bank refused to let her have more. She purchased some lots from Mr. Neil B. Field for $6,000, and gave him an assignment of $6,000 of the legacy. She planned to build an apartment house on these lots, and employed some El Paso architects to draw plans. She could not raise the money to build the apartments, and was threatened with suit by the architects for their fees. She had respondent go to El Paso and adjust the matter. She purchased some lots in San Francisco, for which she agreed to pay about $9,000. She signed a note for $1,400. This the owners of the lots negotiated. In August, 1916, she was being pressed to pay this note, and suit was threatened. Respondent

says that Mrs. Flournoy wanted him to go to San Francisco and attempt to adjust the matter as to the purchase of the lots there. This was denied by Mrs. Flournoy, she saying that respondent himself suggested that he should go to San Francisco. Mrs. Flournoy had a brother, Sam Davis, living in Indianapolis, Ind. It appears that there had been certain financial transactions between the brother and sister. Davis claimed that Mrs. Flournoy was indebted to him for something like $1,800, and had either brought suit against her or was threatening to do so. This was immediately prior to August that he was pressing his claim.

In all these various transactions, and in many other matters, respondent represented Mrs. Flournoy as her attorney. In August, 1916, respondent claims that Mrs. Flournoy was indebted to him for services rendered outside the contract of employment herein set out in an amount in excess of $2,000. In July, 1916, Sam Davis, the brother, came to Albuquerque, and he and Mrs. Flournoy affected a settlement, by the terms of which it was agreed that she was indebted to him in the sum of $1,800. She had no available cash, and needed money upon which to live. Her brother agreed to advance her money to live on, and to meet her pressing requirements provided she would execute to him an assignment of a $5,000 interest, in her legacy. The money derived from the assignment was to pay him $1,800 agreed to be owing to him, and the balance was to be used as Mrs. Flournoy might, from time to time, require it. She made the assignment, which was prepared by respondent. This was done on the 2nd day of August, 1916. The assignment was apparently left in the possession of respondent, for later on Davis wrote him a letter, asking that the assignment be forwarded to him at Indianapolis, Ind., so that he could use it to procure money from the bank to meet the requirements of Mrs. Flournoy. Respondent sent the assignment to Davis some time during the fall or winter of 1916, the date not being material. Whoever held the assignment, however, was holding it for Davis.

On August 19, 1916, Mrs. Flournoy executed to respondent an assignment for the remaining $5,000 of the legacy left her by her late husband. The respondent gave to Mrs. Flournoy his nonnegotiable promissory note for $5,000, which was made due and payable in June, 1917. The same day that respondent secured the assignment he took it to the First National Bank of Albuquerque, and assigned it to the bank, taking credit for the amount thereof on an idebtedness which he owed the bank.

As to all the foregoing facts there is no dispute. We come now to a consideration of the evidence which is more or less conflicting.

The first sharp conflict is as to why the assignment was given to respondent. He testifies: That Mrs. Flournoy had transferred to other parties the remainder of her legacy; she had but this $5,000 left unassigned. He had been informed by Col. Sellers, of Albuquerque, who was a close friend to Mrs. Flournoy, that she had executed assignments amounting to $40,000 against her expected interest in the community property. She was owing him more than $2,000 outside of the 20 per cent. which he was to receive under the contract. He was afraid he would not receive any money for the work done and to be done.; in other words, that she would.dissipate her entire estate, and he would be without remuneration for the great amount of work and labor done and to be done. That she came to him and asked him if she could not transfer the remaining $5,000 to her son, Lynn Welvert, and thus place it beyond her creditors. That he told her she could not. That they could easily set such a transfer aside. Then she asked if it would be any better for her to transfer it to respondent, and he told her it would not. At this time the San Francisco people were pressing her for a settlement of the $1,400 note, or rather the assignee of the note was demanding payment. She was seeking to get this money beyond their reach. Respondent states: That he told her she

could not transfer the remainder of the legacy to him
because creditors could set it aside. That that would be
no better than transferring it to her son. That she then
went home, and he got to thinking about his situation,
when he realized that she was trying to get the last
$5,000 out of her hands, and he had heard she had made
all the other assignments against the expected interest
in the community property. That after two days he
sent for her, and told her she could transfer the $5,000 in-
terest to him, not to defraud her creditors, but for the
bona fide purpose of securing him for the fees due and
to become due; that if she would make the transfer, as
he owed the First National Bank, he would take the assignment to it, and apply it at once on money he owed
the bank, so that there could be no possible question with
the creditors. That she owed him between $2,000 and
$3,000, and he hoped she would owe him $8,000 or $10,-
000 more when community property case was settled;
that he would take the $5,000, and if, in the end, when
the litigation was terminated, she owed him more than
that, she would only be required to pay the balance; if she
owed him less he would refund. That she made the assignment to him. That he took it down to the bank and
transferred it as stated, and took credit therefor. Two
days later he says she returned to his office and asked him
what she had to show for the $5,000 in case anything
happened to him, or there was not that much coming to
respondent. She asked him to give her a note for the
total amount. This he did, giving her the nonnegotiable
note referred to. He says he gave her the note for the
full amount so as to put upon himself the burden of
proving that he had earned any amount which he claimed
as an offset.

Mrs. Flournoy's story of the transaction is quite dif-
ferent. She says the assignment was made, upon re-
spondent's suggestion, to place that amount of money
beyond the reach of her creditors, in other words, to de-
fraud her creditors; that respondent gave her the note
in question as evidence of the fact that he owed her the
amount represented by the assignment; that he was to

pay such amount to her when he collected the assignment.

It becomes very important, in so far as this phase of the accusation is concerned, to determine which account of the transaction is true. If respondent told the truth about the matter, while his action was not very commendable, it would hardly justify his disbarment. If, on the other hand, Mrs. Flournoy's story is true, respondent was guilty of withholding money belonging to his client and appropriating the same to his own use. Under the facts he would also be guilty of advising his client to place her property beyond the reach of her creditors, and thus defraud the process of the court. This charge, however, is not laid against him in the accusation, and will not be considered. He did collect the $5,000, used it for his own personal uses, and failed and refused to account to his client therefor. From other facts appearing in the case, which story is entitled to be believed?

Prior to the filing of this accusation, respondent has stood high in this state as a citizen and a lawyer. He has frequently been honored by the people of the county in which he lives and of the state. At the time the accusation was filed, he was a member of the state senate, and the members of this court have always had the greatest confidence in his integrity. In no case would this court disbar an attorney, and thus stigmatize him as unworthy of the confidence of his fellow men, thereby depriving him of the right to practice a profession which years of toil and labor have earned for him, unless the evidence irresistibly requires such action. What are the further facts properly deducible from the evidence?

The bank was pressing respondent for the payment of his indebtedness. It would not advance money to Mrs. Flournoy on the assignment, but took it and applied it on respondent's debts. This is but a straw, showing the pressing need on the part of respondent for money. Of course, inability on the part of a lawyer to

meet his obligations does not tend to show that he is dishonest and unfit to practice his profession. This circumstance is stated here simply to show motive.

Mrs. Flournoy came to him with the propostion that she was ready and willing to transfer this portion of the legacy, the last remaining, to defraud her creditors. He did not advise her that it would be wrong to do so. He simply told her that it could not be done successfully according to her plans.

Two days after the assignment was executed respondent wrote a letter to Sam Davis, the brother of Mrs. Flournoy, in which he said, speaking of the San Francisco creditors:

"The Ellis Land & Dock Company has filed suit and I am taking steps to defend the suit and at the same time to protect your sister's interest, so that they cannot take her last dollar from her in the event they get judgment."

This letter, which respondent admitted · writing, is wholly irreconcilable with his present contention. He himself, testifying as a witness in the district court, in the civil suit against him by Mrs. Flournoy, could give no reasonable or satisfactory explanation of this letter. We quote from his testimony as follows:

"Q. Did you not write a letter to Mr. Davis on the 22d of August, 1916, two days after you got this assignment (handing paper to witness); did you write that letter to Mr. Davis at that time? Can you tell me whether you did or not? Is that your letter? Is that your signature? A. Yes, sir.

"Q. In that letter you say: 'The Ellis Landing & Dock Company had filed suit and I am taking steps to defend that suit and at the same time to protect your sister's interests, so that they cannot take her last dollar from her in the event that they get the judgment.' What steps were you taking to protect her interests so that they could not collect the judgment if they got it? A. I don't know to what they refer, except that I had given her a note, Mrs. Flournoy a note, so that if there was any amount over that she didn't owe me at the time, that she would get that. I had agreed to give Mrs. Flournoy back any amount over the amount due me out of the $5,000.

In re Barth, 26 N. M. 93.

"Q. Well, now, just how would that protect her interests against these San Francisco people? Will you explain that? A. Well, that is the only way that I know of that it might have.

"Q. Isn't it true that what you had in mind was the fact that you had got an assignment of that so that these people could not get that away from her? A. No, sir, it was not.

"Q. This was two days or one day after? A. I think that was written the day after the assignment was given.
"Q. And you tell the court that you didn't mean in that that you were getting this legacy away so that the San Francisco people could not get it. A. No, sir; I mean to tell the court that.

"Q. If you can give any other reason than that, please give it. A. I see no reason why I should give my explanation. You have given yours.

"Q. If you have any other explanation, give it now. A. That is the only explanation that I have. That I had protected myself as far as I was concerned as to what she owed me, and that under these circumstances those people could not take this from her because she had paid me for past and future services and the money expended for her.

"Mr. Wood: I offer that in evidence. (The paper referred to was then marked Plaintiff's Exhibit AK, and received in evidence.)

"Q. How was that protecting her? I can see how it was protecting you. A. It was protecting her because if the San Francisco people took the $5,000 that she had on their judgment, that would be taking $5,000 for something that they had never given her any value for. If she paid it to me, she was paying me what she owed me, as she was paying me for services in her own case. If the San Francisco people took it, she would still be out the money that she owed me.

"Q. And if you took it, she would still be out the money she owed them. A. That is for the court; that is argumentative. I think it was protecting her."

In this letter, of course he referred to the assignment just made to him, and placed his interpretation upon it.

Another strong circumstance which tends to discredit respondent's story. If he told the truth about the transaction, why, instead of giving a note back to Mrs. Flournoy for $5,000, did he not embody the transaction and agreement into a written contract? If his story was true, the parties had nothing to conceal.

Sam Davis, the brother, testified that in November, 1917, respondent was in Indianapolis, and that he had a conversation with him, in which respondent told him that he had taken the assignment of $5,000 from Mrs. Flournoy in order to prevent creditors from reaching the fund. Respondent admits that he was in Indianapolis, that he talked with Davis, but he denies that he made this statement.

Respondent collected the money due on the assignment October 15, 1917, together with other moneys, which will be adverted to later. He turned it over to the bank on the assignment which it held. He did not advise Mrs. Flournoy that it had been paid, but in letters to her, to her son, Lynn Welvert, he covertly concealed the fact. For example, on November 1, 1917, he wrote Mrs. Flournoy a letter advising her that he had received from the executrix the sum of $1,335, being the amount of the widow's allowance. He sent her no money, however, but showed charges against this fund of $1,556.55, including $267 attorney's fees. He had at this time in his hands belonging to his client, assuming that the $5,000 was her property, more than $7,000. He had collected every cent from the executrix that was coming to her, except such sum as she might thereafter recover in the community property suit and from the insurance. There had been a final settlement between the executrix and respondent, as Mrs. Flournoy's attorney, to that date. The furniture judgment, so called, had become final and unappealable, and that judgment and the costs were deducted. Yet respondent writes his client:

"Now your brother has sent his assignment for collection and I think it will be paid soon.

"The balance of the money due you is held out by Mr. McMillen [the attorney for the executrix] until the case is decided as he wants to be protected, so he says, in case they fail to recover costs from you, and in order to pay the judgment against you for the furniture and the costs of the note that the bank sued on.

"As far as the furniture case is concerned, it will be several months yet before that is decided, but I think the Supreme Court will decide that in our favor also."

In re Barth, 26 N. M. 93.

As we shall see later, this information, about the Sam Davis assignment was false. This letter is not consistent with honesty and fair dealing between client and attorney. He had not taken an appeal in the furniture case, and the time for so doing had expired. There was no money withheld until a case should be decided, for, as stated, the judgment evidently referred to had become final and unappealable. The executrix had appropriated something like $3,000 to the payment of the judgment and costs referred to, but this had been taken up by interest due on the legacy, amounting to approximately that sum. Respondent did not frankly and truthfully state the facts to his client; he owed it to her to advise her fully as to the moneys collected, and we can conceive of no valid excuse for his failure. After this letter was written, other letters and communications passed between respondent and his client, in none of which did he tell her that he had collected this $5,000 or other moneys later referred to. Finally, in January, 1918, Mrs. Flournoy consulted Mr. Harry W. Hanson, a lawyer of Los Angeles, and a friend to her father and mother. To him, Mrs. Flournoy evidently told the same story about the assignment which she told here on the stand. She also showed him a letter from Sam Davis, telling her that respondent had collected all her money and the money on his assignment. Hanson wrote to respondent, under date of January 24, 1918, as follows (omitting unimportant portions) :

"Mrs. Flournoy, I regret to say, is in a very bad state of health, no small portion of which of course is due to the legal troubles she has had in connection with her late husband's estate. She has given me a general power of attorney, a copy of which I inclose herewith, and thereunder it shall be my purpose to assist in any way that I can in the matters in which she is interested. I do not intend, and I wish you to distinctly to understand that I am not endeavoring to catapult myself into the matters of litigation which you are handling. I do, however, desire to be advised of the present status of the matters concerning which I shall inquire and will endeavor to ask no more than Mrs. Flournoy herself would be justified in asking under the circumstances.

"As nearly as I can determine from what she has stated to me and such correspondence as she has delivered to me, her matters stand substantially as follows:

"She is entitled to $20,000.00 under the second paragraph of Mr. Flournoy's will, together with interest thereon at the rate of eight per cent. per annum, payable monthly from the date of Mr. Flournoy's death. Against this fund she appears to have given the following assignments:

"(1)  To Mr. Field of your city, $6,000.00;

"(2)  To her brother, Sam Davis, of Indianapolis, $5,000.00;

"(3)  To the First National Bank of Albuquerque, $4,000.00; and

"(4)  To yourself $5,000.00 offset by a note given by you in her favor for $5,000.00, which latter transaction was done she says upon your advice for the purpose of protecting her from possible claims or suits against moneys coming to her from the estate."

"In a letter from Sam Davis to Mrs. Flournoy dated January 2, 1918, he says that he had written you and had received a reply to the effect that you had received all of this money for Mrs. Flournoy. If this is the fact, she desires that that money be forwarded to her at this address as she says she is in serious need of funds."

Here we find respondent confronted with the statement that Mrs. Flournoy had given him this assignment for the purpose of protecting her from possible claims or suits and to save the money coming to her from the estate, and that it was given upon his advice. Also there was a statement that he had collected the money and a demand for its transmittal. The claim thus made to him was wholly inconsistent with his statement of the transaction, and naturally it would be supposed that he would at once set the Los Angeles attorney right on the matter.

On January 29, respondent replied to this letter stating that he was very busy in court, and that he would not have time to answer the letter in full for several days, "but will do so in detail as soon as I possibly can." On February 9th, Mr. Hanson advised respondent, by letter, that Mrs. Flournoy was very much worried over her financial affairs and was ill, and that if respondent would send a full statement it would greatly assist Hanson in explaining matters to her. From thence until April 28, letters passed between Hanson and respondent,

yet not in a single instance did respondent contradict
the statement contained in Hanson's letter of January
29th to the effect that he had taken the assignment of
$5,000 for the protection of Mrs. Flournoy against her
creditors.   In a letter of April 28th, more than five
months after he had received the moneys from the execu-
trix, he, for the first time, set forth the contention which
he urged in his defense in this court.   The material part
of this letter reads as follows:

"I most certainly appreciate the seriousness of the state-
ments made to you by Mrs. Flournoy and expressed in your
letter which awaited me on my return from the East.   The
statement is not correct that Mrs. Flournoy merely assigned
to me the $5,000 and that I promised to pay them to her im-
mediately upon receiving them from the executrix.

"I had won for Mrs. Flournoy an electric auto, had won ex-
emptions in jewelry, furniture, etc., and I was entitled to
twenty per cent. of their value.   I had won a suit against her
for $1,800 and we thought that I was entitled to $360 on it—it
has since been reversed and so I am not entitled to it.   She
owed me fees on three other suits which I was handling for
her outside of the estate suits.   She was being sued for $1,400
and threatened with suit for $7,500 more on account of a land
deal in San Francisco.   She had assigned all that was coming
to her from the estate except $5,000.   The attorney for the
executrix was attorney for the San Francisco parties.   She
wanted me to go to San Francisco on that matter and had no
money to pay me either a fee or my expenses.   She was afraid
that they would garnishee her remaining $5,000 and proposed
to assign to her son.   I advised her that such an assignment
would avail her nothing and then she suggested assigning to
me and I advised her that such an assignment would not
stand, but suggested that inasmuch as I would have much
more than that amount coming from her when her cases were
concluded; that I owed the First National Bank here $5,000,
that if she would assign that to me I would turn it right over
to the bank and that such an assignment would be valid be-
cause she would have a right to pay me for past and future
services, that I would advance and take care of the costs in
all her cases in the future, which were then pending and when
we finally settled our affairs that I would credit her with the
$5,000.   I said that I would give her my note for the $5,000
and if at the time we settled I did not have that much
coming to me I would immediately pay her the difference.
She agreed, gave me the assignment and I immediately turned
it over to the bank.   I gave her my note.

"Outside the assignment I have received on Mrs. Flournoy's
account $2,021.30 and I have paid out for her account some-
thing over $2,300.   I have not the time right now to make

an itemized report of the expenditures but I will return from Arizona on the fifth; the following week we will take further testimony in the community property case which I have had reopened for that purpose. Following that I will go in to Los Angeles and we will have a thorough understanding of this matter and you shall be the judge.''

Would a man rest for three months under a charge that he was withholding $5,000 belonging to another, which he had taken to defraud the creditors of the other, and that he had promised to pay over the money when collected, without a denial thereof, if it was not true? It is beyond belief that he would do so. From the facts it is evident that respondent was deeply involved financially; he was hopeful of receiving financial assistance, which failed to materialize. He was putting off the day of accounting from day to day; he did not care to take a position on the matter in January, 1918, because of the hope that he would soon raise the money and be able to adjust matters. Finally, in April, realizing that further delay was hopeless, he wrote the letter, laying claim to the money for the first time as his own. We believe no reasonable man can come to any other conclusion.

In addition to the cold facts shown by the record, in many instances, as will appear later, respondent, while testifying as a witness, misstated the truth; hence his account of this transaction is not entitled to the credit which might otherwise be accorded to it.

[1, 2] From the evidence we find that Mrs. Flournoy made the assignment in question to respondent for the purpose of defrauding her creditors, under an agreement upon the part of respondent to account for the same when it was collected. That he failed to account for the money is admitted. Likewise the fact that he appropriated it to his own use. The accusation, it is true, charged that respondent took the assignment under an agreement to render Mrs. Flournoy financial assistance from time to time as she might require it; that he failed to render such assistance and collected the money, and failed to account for it. Mrs. Flournoy testified

that he took it to keep her creditors from reaching it, and that he also promised to render her financial assistance, which he failed to do. The facts established do not warrant the conclusion that he had promised to advance her money from time to time. The gravamen of the offense charged, however, was the failure to account for the money and appropriating the same to his own use. Respondent had not paid over the money at the time of the hearing in this court, and here claimed, as heretofore stated, that the money was rightfully his.

The fourth count of the accusation charges respondent with the collection of the $5,000 referred to in the foregoing discussion under the assignment, and in addition thereto the sum of $686.30 under the widow's allowance; the appropriation of the moneys to his own use, and his failure and refusal to account therefor.

On October 15, 1917, respondent collected from the executrix moneys admittedly belonging to Mrs. Flournoy, amounting to between $1,500 and $2,000, the exact amount being immaterial here, but it probably was in the neighborhood of $1,800. This collection was outside the assignment, and was made up of an item of $950 balance over on the Sam Davis assignment, $686.30 on the widow's allowance, the balance being withheld by the executrix to pay the judgment in the furniture suit or some other charge, interest $233.33, and possibly other small items. The only advice he gave his client in regard to these collections was the letter of November 1, in which he erroneously state that he had collected thirteen hundred odd dollars on the widow's allowance, and against which he showed credits of more than $1,600. He had charged certain fees and disbursments against this money, holding the $5,000 assignment intact, or, rather, claiming that, in addition to earned fees and disbursements in other matters. This claim apparently was put forward in an attempt to justify the failure to account to his client for this money. In other words, he testified as a witness that the $5,000 assignment was not to be used, or its proceeds rather, for the payment of

costs and expenses, and earned fees in matters other than the community proper suit. He says this assignment was to be held as collateral security for the expected big fee, and that Mrs. Flournoy was to pay him these other fees and expenses, costs, and charges as they were earned. His statements in regard to the matter were more or less conflicting, but his explanation given, in answer to questions by a member of the court, is as above stated. This explanation only could justify the retention of these outside items, for if the services and expenses referred to were properly chargeable against the $5,000 which he had had in his hands, or, rather, had had the use and benefit of for more than a year, then he could not possibly justify the retention of the smaller item. While testifying as a witness, and giving for the first time an account of the transaction and conversation leading up to the assignment of the $5,000 item, he said that Mrs. Flournoy was indebted to him in more than $2,000 for services rendered outside the written contract of employment, not contingent upon the outcome of the "big case," and for money expended on her behalf; that he had made a trip to El Paso for her at his own expense; that she was asking him to go to San Francisco for her, and she had no money with which to pay his expenses, and that he used all this argument in explaining to her why she had the right to assign to him the $5,000 item. and why such an assignment would be good as against creditors. Had he applied the $5,000 for the purpose of paying these various items, of course Mrs. Flournoy would clearly have been entitled to the other moneys collected outside of this item.

His account to this court, viz. that no part of this $5,000 item was to be used for current expenses and fees which he might earn outside the "big case," but that these items were to be taken care of by Mrs. Flournoy from time to time, will not stand analysis. He was taking the last $5,000 which Mrs. Flournoy could expect from the legacy. Her brother had taken an assignment of $5,000 in which she might expect a $3,000 advancement to enable her to live. He knew, or should have

In re Barth, 26 N. M. 93.

known, that the interest on the legacy would be consumed in taking care of judgments against his client; that she was owing for the $1,400 judgment which Weinman had paid; that when he took the big assignment she was practically stripped of means of raising cash, so he must have known that she would have no way of paying him these costs and charges as they were earned from time to time. He also knew that she was expecting this money, and that she thought it was to be paid-over in September; he knew by letters from her and from her son, and later from her Los Angeles attorney, that she was expecting the money, and was claiming, not only the smaller items, but the $5,000. He was advised from time to time that she was ill, caused by worrying over her affairs. He was, within two months after he had collected the money, and after he had already spent it, negotiating a loan for her on her Albuquerque lots, heretofore mentioned, for the purpose of paying $1,400 or more to free the lots from the Weinman debt, and advising her to make the loan for $500 more in order to get money to tide her over. He did make the loan, and sent her the $500. During all this time from October 15th to April 28th the following year, he failed to render her a statement, to tell her what amount he had collected, and that he had applied it on accounts which she was owing to him. He owed to his client the duty of keeping her advised as to all these matters, yet we find him deceiving her. He told her November 1, 1917, in a letter that he had collected the widow's allowance, and rendered her a statement, showing that he had applied the same on certain debts, and showing a balance still due him. It is an admitted fact that respondent deposited this money, and the $5,000 received on the Davis assignment in his personal account with the First National Bank on October 15, 1917, and that the same had all been paid out by him, for his own use and benefit, within 15 or 20 days. He did not have it between that date and the 19th of December thereafter. Then he received $5,000 from Ramon Garcia, with which he bought three drafts, one for $4,050, which he sent to Sam Davis, one for $450, and one for $500. These latter amounts

were the amount of money he was owing to Mrs. Flour-
noy as the balance which was coming to her on the Sam
Davis assignment. In the district court he said that he
had sent her a draft for $500 at that time, and that he
had applied the $450 on debts which she owed. At the
time he gave this testimony he did not admit that he had
secured the money from Ramon Garcia, but testified that
he had it all the time from the time he had collected it
until he paid it out; that it had been in the form of a
draft or other similar paper; that he had simply on the
19th day of December purchased the three drafts men-
tioned. At the time he gave this testimony he said the
bank was not able to find the returned drafts; that they
had made search. Later, and before he gave his testi-
money here, the bank did find the canceled drafts, and
they disclosed that he had not sent the $500 to Mrs.
Flournoy at that time; that he had purchased the drafts
as indicated; that the $500 draft was held by him until
the 31st of December, when it was deposited to his own
personal account and the money was used by him. We
are compelled to find the respondent guilty under the
fourth count of the accusation.

The seventh count of the amended accusation reads as
follows:

"That on the 15th day of October, 1917, A. B. McMillen,
as attorney for Mrs. Andros, the executrix of the last will
and testament of M. W. Flournoy, deceased, paid to Isaac
Barth, attorney for Sam Davis, assignee of Mrs. Jeanette W.
Flournoy, the sum of $5,000. On the same date the said Isaac
Barth deposited the said amount to his personal credit in the
First National Bank of Albuquerque, N. M., and within the
course of one week thereafter disbursed said sum of $5,000
in various small amounts, except one item of $3,500. That on
the 3d or 4th day of December, 1917, or thereabouts, the said
Isaac Barth wrote the said Sam Davis to the effect that the
said Isaac Barth had not received the said sum of $5,000, and
that the said Sam Davis should exercise patience, and that
upon the return of the said Isaac Barth to Albuquerque he
would collect the said sum of $5,000, and remit the same to
the said Sam Davis. Whereas, in truth and in fact, the said
$5,000 had already been collected by the said Isaac Barth, and
that said letter was deceitful, and a deception practiced by
the said Isaac Barth upon his said client, and thereby the said
Isaac Barth was guilty of misconduct and unprofessional con-
duct."

Many of the facts have already been stated upon which this charge is based. Respondent by his answer admitted that he had collected the money, but he denied that the relation of attorney and client existed between himself and Davis. He admitted that he collected the money on the 15th day of October, 1917, and that he did not remit to Davis until the 19th day of December thereafter; that he delayed the settlement in order to ascertain from Davis the amount which he claimed that he had advanced for Mrs. Flournoy, and to get Mrs. Flournoy's approval of such account.

On September 24, 1917, respondent, knowing that the legacy would soon be paid by the executrix, wrote to Sam Davis at Indianapolis, Ind., as follows:

"Have today got an order from the district court here requiring Mrs. Andros to show cause why she should not be punished for criminal contempt for failing to pay the allowance to your sister after the Supreme Court has decided that case in her favor and she must show cause on the 29th.

"If you will send me your assignment and indorse on the back an authority to collect it, I will make a demand for it, and if it is not paid immediately I will bring suit.

"Am very much inclined to believe that if I go after it they will pay it as they have not had very much luck with their side of these lawsuits. Give this immediate attention, and I think we can get your money within the next two weeks."

On October 2 Davis sent the assignment to respondent, and gave him a power of attorney to collect it. Respondent presented it to the executrix or her attorney on the 15th of October, and it was paid to respondent. He took the money to the First National Bank, deposited it to his credit, and spent it all within 15 or 20 days for his own personal use and benefit. Respondent did not even advise Davis up to November 10 that he had received the assignment from him. He probably did not so advise him until the 17th of November, when he saw Davis in person in Indianapolis. Davis wrote him two urgent letters, one on October 15th and another on November 10th, urging respondent to advise him whether

he had received the assignment. · On the 17th of November respondent went through Indianapolis on his way to Washington City, stopped off, and saw Davis and had a talk with him, and Davis states respondent told him he had not been able to collect the ·money due on his assignment.     Respondent admits that on that date he saw Davis and talked with him about the matter, and purposely deceived him; that it was possibly ill advised, but he did it to keep him from demanding a settlement until respondent had ascertained definitely the amount of money Davis had advanced for Mrs. Flournoy.

Davis became uneasy, and consulted an Indianapolis attorney, who wrote to Mr. John F. Simms, a lawyer of Albuquerque, who, on November 27th advised the Indianapolis attorney that the item ·had been paid to respondent on the 15th of October.   On November 30, Davis wrote respondent, advising him that he had been informed that the assignment had ·been paid, and asking for a remittance.     On December 5 respondent wrote Davis as follows:

"Have had a talk with the executor, and they say that it will not be necessary to bring a suit to recover that amount due on your assignment, and that they will endeavor to raise the money so as to pay it and at the furtherest delay, it will not be more than· 30 days until they have paid your assignment in full.   I think this is better than having. any trouble about it and I also think that they are interested in getting the thing closed up and will probably pay it before the first of the year."

On October 25th,· 10 days after he had collected the money, respondent wrote Lynn Welvert, and in regard to the Davis assignment said:

"Your uncle has sent his assignment to be collected but he has not been paid yet, but before he is paid I want' to have you send me the copy of your mother's agreement with him and also let me know how much money he has advanced to her.   He says that in addition to the $1,900 which she owed him that he has sent her $1,800.   Please let me know if this is correct so that when the amount is paid I can send him exactly what is due him."

On November 1 he wrote Mrs. Flournoy, and, among other things said to her:

"Now your brother has sent his assignment for collection, and I think it will be paid soon, and he claims that you owe him $3,785.00, and I am sending you herewith the bill which he sent me. If that is correct we will send him the $3,785.00 out of that money for you."

Respondent admitted on the stand that he had deceived Sam Davis as to the fact that he had collected the assignment in question; admitted that he had purposely deceived Mrs. Flournoy and Lynn Welvert, her son. He attempted to justify his action as follows: First. He claimed that the relation of attorney and client did not exist between himself and Davis; consequently he owed Davis no duty. Second. He was fearful, if he advised Mrs. Flournoy that he had collected the full amount of the assignment, that she would insist that he should send the full $5,000 to her; that he was fearful that if he did not obtain an agreement between Davis and his sister as to the amount to which each was entitled that litigation would result.

We think the letter respondent wrote Davis, asking that he send the assignment to him for collection, clearly establishes the relation of attorney and client. The fact that respondent collected no fee is of no consequence. He told Davis that if it was not paid he would bring suit, and, if he was not representing him as attorney, we fail to see where he expected to get the authority to bring the suit. Of course he should not have taken the item for collection, because his duty to Mrs. Flournoy, who had an interest in the assignment, or the money to be collected, and who was entitled to an accounting from Davis, might have conflicted with his duty to Davis.

He says he purposely wrote Davis for the assignment so that he could get the matter into his hands and protect Mrs. Flournoy's interest. This action cannot be justified under any theory, regardless of whether he was, or was not, attorney for Sam Davis. He had no right to get possession of this money, in the manner he did, for any such purpose.

Respondent did not pay Davis until the 19th day of December, 1917. He used the money for his own personal use and benefit, and told an untruth to Davis, to Mrs. Flournoy, and to her son about the matter. All this he admits, but says he did it to protect Mrs. Flournoy's interest; that he desired a statement from Davis as to the amount he had advanced, and was fearful, if Davis knew he had the money, the statement would not be forthcoming; that Mrs. Flournoy would probably have demanded the whole $5,000 if she had known that he had the money, and there would have been litigation. This, of course, was no justification, and it would establish an anomalous relation between attorney and client to hold that an attorney under some circumstances is justified in deceiving his client, and to say that he is the judge when such an occasion arises. No possible situation could arise under which an attorney could rightly so act.

The evidence clearly shows, we think, that all the trouble was occasioned by the fact that respondent expended the money for his own use, and was not able to replace it. He thought evidently that from day to day he would be able to raise it, and staved off the evil day. In this court, as a witness, he first testified that he had the money, or drafts and cashier's checks for the amount, during all the time after he had collected it. This, of course, he could not substantiate, because counsel for the state demanded to know through which bank he had purchased such drafts and checks. The account which he carried in the First National Bank showed that he had checked out $3,500, which had been paid to the Estancia Savings Bank. He then said that he had the money to pay Sam Davis with in that bank, and had put it there so as to save it and have it when demanded. Later, when he learned that the Attorney General was taking steps to secure the attendance of some officer of that bank, he took the stand, and admitted that he had expended that $3,500 for his own uses. Then he made many contradictory statements as a witness as to where he procured the $5,000 with which settlement was made

on the 19th of December. First, he said, as we have stated, that he had had it all the time from October 15th until payment was made; he was driven from this position, and then said he had earned it in fees; and, finally, he told that he got it from Ramon Garcia, which was true, and, as we now remember the evidence it was a loan. All these matters tended materially to weaken the testimony of respondent. But his ultimate admissions showed that he had used this money, and that he had deceived his client, Mrs. Flournoy; that he had deceived Sam Davis, and the only thing he relies upon to save him from the consequences of such action is that he did not act as attorney for Sam Davis. The letter quoted from takes from him this supposed haven, and establishes clearly the relation of attorney and client. Such being the case, there is but one conclusion, viz. that he is guilty under the seventh count.

In Thornton on Attorneys at Law, § 810, it is said:

"It has been said that no circumstances in which an attorney may be placed will warrant him in appropriating to his personal use the funds of his client, or justify him in falsely stating that such funds are not in his hands."

Under the fifth count it was charged that the Stockmen's Guaranty Loan Company, of Albuquerque, was indebted to T. E. Mitchell, of Union county, in the sum of $2,500, which was due and payable on the 6th day of May, 1916; that respondent had represented Mitchell in the matter out of which the liability of the Stockmen's Guaranty Loan Company arose; that they were unable to pay the money in cash; that they had a note in the sum of $3,750, which was due September 1, 1916; that in order to raise the money to pay the $2,500 Mitchell indebtedness, the Stockmen's Guaranty Loan Company had turned over to respondent the $3,750 note owing it by John Q. A. Otero, with the understanding that respondent should use the note in procuring a loan from the First National Bank in the amount of $2,500 in order to take care of the Mitchell indebtedness; that, instead of so doing, respondent sold the note outright to

the First National Bank for $3,000; that he appropriated the excess over $2,500 to his own use and benefit, and had failed to account to the Stockmen's Guaranty Loan Company for the same.

A considerable amount of testimony was introduced upon this count of the accusation. Respondent did sell the note outright to the bank, and did not account to the company for the $500 at that time. He claims, however, that he used the money with the consent of the officers of the company, and detailed various transactions between himself and the officers of the company, which, to say the least, raises a very serious doubt as to his guilt under this count of the accusation. He testifies, and it is not seriously disputed by the officers, that it was known to the officers of the company at the time that he intended to sell the note to the bank; that he advised them that the bank would not make the loan, but would purchase the note. We are not able to say that the evidence shows respondent guilty under this count, and for that reason there will be a finding of not guilty.

The eighth and ninth counts will be disposed of at this time. The eighth count of the accusation was dismissed by the Attorney General, without prejudice; the ninth count was unsupported by proof, and as to this count there will be a finding of not guilty.

The trial amendment which supplanted the sixth count of the amended accusation charged that respondent had practiced fraud and deceit upon one T. E. Mitchell, a client of respondent, and while such relation existed, for which he should be disbarred. The facts were fully stated in the accusation, and denied by respondent, in so far as he was charged with wrongdoing. The facts are as follows:

Prior to October, 1915, T. E. Mitchell, of Union county, had subscribed for $10,000 worth of stock in the Stockmen's Guaranty Loan Company, of Albuquerque. For the $10,000 he was to receive stock of the par value of

$5,000. He gave two notes for the stock, one for $7,500 and one for $2,500. In October, 1915, Mitchell became dissatisfied with his bargain, felt that he had been induced to buy the stock by fraudulent misrepresentations, and went to Albuquerque to employ counsel to secure the rescission of the contract and the return to him of the notes. He was advised by some one to consult with the respondent and did so, with the result that a contract was entered into between Mitchell and respondent, ·by which respondent agreed to attend to the litigation for the sum of $500, $250 being paid in cash, and the balance to be paid upon the termination of the litigation. Respondent, after some negotiations with the officers of the Stockmen's Guaranty Loan Company, succeeded in reaching an agreement with the company, under which, according to the testimony of respondent, the parties were to leave in the care and custody of respondent the $7,500 note, so that it could not be negotiated, until the 6th day of May, 1916. The $2,500 note, having been negotiated by the company, was beyond its control, and it was agreed that $2,500, representing $1,250 par value, in stock, should be issued to Mitchell; that the Stockmen's Guaranty Loan Company would sell this stock within six months for $2,500, the amount to be paid to Mitchell. Respondent said further that under the agreement the company at all events had agreed to pay Mitchell at the expiration of six months $2,500 for the stock in question, which was in lieu of the note which it had negotiated. At that time the $7,500 note was to be surrendered to Mitchell, and the contract canceled. The respondent advised Mitchell as to the terms of the settlement, sending him a copy of the contract. Afterwards there was some correspondence between Mitchell and respondent, which indicated that Mitchell was not altogether satisfied with the settlement arrived at. He, however, later paid respondent the remaining $250 due him as his attorney's fee. A copy of the agreement was transmitted by respondent to Mitchell about the 3rd day of November, 1915, under which the time for performance was fixed at the 6th day of May, 1916.

Afterwards, on the 2nd day of December, Mitchell wrote respondent:

"I should like to have you offer me convertible for the $2,500 in stock you say you got for me and seem to think it worth that or perhaps about that. If you have knowledge of any one who would give something akin to the amount please make a fair commission by putting the deal through."

On December 7, respondent wrote Mitchell, among other things, as follows:

"Relative as to what you say about the twenty-five hundred dollar ($2,500) stock and my selling it for you will say that I know nothing about selling stock, and can probably not do much at it.

"There is no doubt in my mind that the stock is not worth anywhere near par, and if I had thought so I would have advised you to keep the stock, where you had subscribed; and the proposition that you make me to sell the stock for twenty-five hundred ($2,500) dollars, retain two hundred fifty ($250) dollars, and remit two thousand two hundred fifty ($2,250) dollars is out of the question.

"However, I will do this: I will give you one thousand two hundred fifty ($1,250) dollars in cash for your stock. I think it is worth fifteen hundred ($1,500) dollars, but there is no occasion for me investing in it without any profit, and I am inclined to think that the stock is worth more to me than it is to anybody away from here.

"However, I am not anxious to acquire the stock."

There was not produced at the hearing any further correspondence relative to the stock transaction until a letter of March 7, 1916, in which Mitchell wrote respondent as follows:

"Noticing that the Guaranty Loan people are having a big run of prosperity, at least one might think so, from the renewed 'bills of health' Auditor Whittier sees fit to shower upon them at frequent intervals; and I thought perhaps you would want to raise your bid on the block of stock I am supposed to be interested in to $1,500 cash. Let me know if you would not like to take it on that figure?"

Mitchell testified that he thought respondent wrote him in reply to his letter to him of March 27, offering to pay him $1,250 for the stock, and that he had accepted the offer; that he had received a draft for $1,250

for the stock the latter part of May. Respondent tes-
tified that in response to Mitchell's letter of March 7
he had written him that he would pay him $1,250 in all
events for the stock within 60 days; that his proposi-
tion was accepted, and that by the transaction the stock
became his, and that he later paid the stipulated price.

The vice in the transaction was in this: Respondent
knew that the company, being solvent, would, on the
6th day of May, be required to pay to Mitchell $2,500.
He was familiar with the report as to the financial status
of the company made by the traveling auditor in No-
vember, 1915. This report showed that the stock of the
company was worth 101. The stock had been sold origin-
ally for $2 a share, and, while there was some depletion,
the report showed that the company was able to pay
the stockholders, after paying all its liabilities, 101 per
share, and that it was far from insolvent. The respond-
ent in his testimony admitted that he did not tell Mitchell
that the company was solvent, and would be responsible
financially for the $2,500. He says that it had not oc-
curred to him that the company would be required to
pay all its debts and obligations before there would be
anything coming to the stockholders. Early in April,
1916, the Stockmen's Guaranty Loan Company turned
over to respondent a note signed by John Q. A. Otero
for $3,750, heretofore referred to, so that respondent
might realize a sufficient sum of money to liquidate its
obligation to Mitchell. Respondent received on the note,
which was applied in liquidation of the Mitchell claim
$2,500. Some time after the 18th day of May he pur-
chased a draft for $1,250, sent it to Mitchell, and re-
tained the balance to his own use and benefit.

[3] That respondent had no right to deal with his
client in regard to the matter which had been intrusted
to him for attention, unless the client was fully advised
as to all his attorney knew in regard to the transaction,
is beyond dispute. Mitchell testified that he was satis-
fied with the transaction; that is, he had made respond-
ent an offer which had been accepted and complied with

on the part of respondent. It was a very questionable transaction to say the least. Respondent knew, or should have known from the information he had at hand, that the Stockmen's Gauranty Loan Company would pay to Mitchell the sum of $2,500 on the 6th day of May. According to his testimony, he made a contract with his client by which he did not obligate himself to pay to Mitchell any money until after the 6th of May, when he knew he would have received from the Stockmen's Guaranty Loan Company the full amount of $2,500.

The relation of attorney and client is one of the highest trust and confidence, requiring the attorney to observe the utmost good faith towards his client, and not to allow his private interests to conflict with those of his client. So zealous are the courts in maintaining unsullied the reputation of the members of the bar, its officers, and in sustaining the confidence and respect of the public in them, that very strict and rigid rules have always been enforced, under which an attorney could not maintain a purchase from his client, unless he was able to clearly show that he had made a full communication to his client of all that he knew of advantage to the client regarding the subject of the negotiations.

The editor of the note to the case of Crocheron v. Savage, 75 N. J. Eq. 589, 73 Atl. 33, 23 L. R. A. (N. S.) 679, states the rule as follows:

"In order to sustain such a purchase, an attorney must affirmatively establish the utmost good faith and fairness of the transaction, as well as the adequacy of consideration, and also that he fully informed the client of the material facts and gave him the same disinterested advice he would have given had the sale been made to a stranger, and that in fact they dealt at arm's length."

The text is fully supported by the authorities cited.

In this transaction with Mitchell, respondent owed his client the duty, before undertaking to deal with him, to fully advise him as to the terms of the contract, and the fact that the company in all events was to pay him

the $2,500 in May, 1916, and that the company was financially solvent and responsible for its obligations. Here the relation of attorney and client in respect to this matter still existed. Respondent had certain duties yet to perform, viz. collect the $2,500 and forward it to Mitchell; also to return to him the note for $7,500 and deliver the stock to the company. Many courts hold that, even after termination of the relation of attorney and client, the attorney will not be permitted to purchase the subject-matter of the litigation without clearly showing the fairness and equity thereof, as well as the adequacy of the consideration. See cases cited in note referred to above.

Respondent then, in regard to this charge, is holding money which a court of equity would require him to pay to his client, under the facts disclosed by the evidence here. He did not tell his client that in his judgment the corporation was solvent, and would in all events pay to him the $2,500 on the stock transaction. In fact, had he done so, it is doubtful whether a court of equity would have permitted him to retain the fruits of a contract so manifestly prejudicial to his client's interest.

His actions in regard to this transaction, and his clearly established guilt under the third, fourth, and seventh counts of the accusation, require his disbarment. No other course is open to this court; and it is so ordered.

PARKER, C. J., and HOLLOMAN, District Judge, concur.

---

(No. 2445.   April 18, 1920.)

(On Motion for Rehearing, May 12, 1920.)

SYLLABUS BY THE COURT

