This is an appeal from the allowance of the district court of an attorney's fee of $3,661.64 against the estate of Frank H. Winston, deceased, for services rendered by James G. Fitch to Ella W. Winston, executrix of said estate.
Frank H. Winston, a resident of Sierra county, N.M., died November 10, 1929. He and Ella Winston were married in 1874 in Wisconsin and in the year 1885 he became a merchant in Sierra county, N.M., and continued his mercantile business at the village of Fairview until the date of his death. Between the years 1895 and 1910 the decedent received as gifts, testamentary and otherwise, sums aggregating $27,650. His will recites these facts and states in detail the properties in which these funds were invested — mainly cattle and ranch properties which were listed as separate property in his will.
James G. Fitch, hereinafter referred to as claimant, was employed by the executrix immediately after the death of her husband, who had advised her to retain him. He performed the usual services for the executrix in connection with the probating of the will and the administration of the estate, and gave advice to the executrix and her assistant when called upon so to do. *Page 350 
The will was admitted to probate the 6th day of January, 1930, and in due course an inventory was filed by the executrix. The property of the estate was duly appraised. The testator's share of the community property was left to the widow, who was named executrix of the will. Provision was also made for an annuity of $1,500 for her out of the separate property of the testator. Several bequests were made to charitable and religious institutions and the Red Cross and Salvation Army were made residuary legatees.
The executrix stated to claimant that the wishes of her husband were sacred, but she later became dissatisfied with the disposition made of the property by the will and the division of the property therein made into community and separate property. She sought other counsel and was advised that she could attack the inventory — an opinion in which claimant concurred. However, he held that the attack on the inventory should be made within the year allowed for contest of probate. Comp.St. 1929, § 154-211.
The claimant wrote the executrix on July 16, 1930, in answer to a letter from the executrix and also a letter from Miss Axtell, the executrix' niece, stating that he had previously intended to point out, "The unwisdom of trying to improve on the terms of Mr. Winston's will, in an attempt (to speak plainly) to get more than he evidently intended you should have," and pointed out that in his opinion the provisions of the will were not only generous but were wise; that testator had given to her his own share of what he regarded as community property, including the store business which seemed to be well established and fairly productive; and to insure her against want for the remainder of her life, his first provision was that out of his separate property she should be paid an annuity of $1,500 per year, involving an investment, as he estimated, of $24,000, but which, in claimant's opinion, was too low, and that, after providing for this, his next thought was of Miss Axtell, for whose annuity he provided the sum of $12,000, which would yield an annual income of $720, at 6 per cent.; that claimant in his practice has known of a good many women whose husbands had left them all their property, and that four-fifths of these women had, through inexperience or faulty judgment, lost practically the entire property in the course of a few years; and that he could not see that executrix would prove any exception to this general rule.
Differences between the executrix and claimant early arose as to the policy of the administration of the estate. The claimant, as indicated by the letter of July 16th, had little confidence in the ability of the executrix to conduct successfully the several businesses in which the estate property was invested, and advised converting the property of the separate estate into cash as quickly as it could be done without sacrifice. The executrix replied, quoting a section of the will which left to her judgment the "time, terms and manner of converting the property into *Page 351 
cash," and refused to sell on the declining market.
It appeared at the time of the hearing that if the executrix had followed the advice of the claimant she would have saved for the estate ten times the amount allowed claimant as a fee. The district court found that the Fairview Cattle Ranch including cattle and real estate was appraised at $36,720, and that at the time the executrix entered into a lease contract of this property covering a period of years the cattle were of the value of $40,000, and that the value of the remnant of said cattle taken back by the executrix upon the dissolution of the contract was $12,000. This contract was entered into without consulting claimant.
The claimant on August 31, 1931, filed his claim in the probate court for $3,661.64, the full amount allowed by statute as attorneys' fees for conducting ordinary probate proceedings. Under Comp.St. 1929, § 47-132, the attorney's fee ordinarily is based upon the appraised value of the estate property and is calculated upon the percentages fixed by the statutes on the several classes thereof. After notice and hearing, the probate judge allowed the claim and ordered it paid within thirty days. The executrix appealed to the district court.
After the administration of the estate had been removed to the district court under Comp.St. 1929, § 34-422, claimant filed his additional claim for his services in connection with the bank matters. He alleged that the estate held 144 shares out of a total of 250 shares of the capital stock of the First National Bank of Hot Springs, and also held as collateral security for certain purposes 45 additional shares of said stock; that the estate's share of a $20,000 note made by the directors of said bank in favor of the State National Bank of El Paso, Tex., amounted to $16,854.55 with interest; that on December 13, 1929, the same national bank examiner, who had conducted previous examinations, visited said bank and found that certain directions which he had given had not been complied with and stated to the board of directors that 50 per cent. assessment on the capital stock would become necessary, or that the entire assets of said bank be turned over and surrendered to some competent parties who would assume the liability of the bank to its depositors; that from that time until June or July, 1930, the larger portion of claimant's time was taken up in unsuccessful attempts to dispose of the Winston stock to reliable parties, in attending numerous meetings of the board of directors of said bank as legal representative of the Winston estate, in meeting national bank examiners and with parties who were contemplating taking over the assets of the bank upon terms approved by the bank examiner, and other work for the Winston estate. This claim for special services was disallowed. There is no cross-appeal. *Page 352 
The decree of the district court recites:
"1st. That by chapter 81 of the laws of New Mexico of 1929 the common law rule regarding liability of executors and administrators for attorneys fees for services rendered the estate was abolished and that the estate is now directly charged with and liable for attorney fees in the sums fixed in said act except as otherwise fixed by the Court upon a showing of proper cause therefor.
"2nd. That in this proceeding the statements regarding the property of the testator set out in the will, as probated more than one year ago, are conclusive and binding on the parties hereto, and the attorney fees should be calculated upon the basis of said statements as carried forward into the inventory.
"3rd. That upon such basis the fees due the claimant from the estate amount to the sum of $3661.64, which is the fee fixed by law.
"4th. That the claimant was discharged by the executrix in the month of October, 1931, and notified that his services as attorney for the estate were no longer required.
"5th. That the services rendered by the claimant in settling the affairs of the First National Bank of Hot Springs in which the estate held stock were not extraordinary services but should be considered as part of the ordinary services as contemplated in the statute.
"6th. That the claimant is a leader at the Bar of the State of New Mexico and possessed of great skill as an attorney practicing before this court."
The executrix contends:
"The Court erred in allowing the claimant more than one-half of the amount which the statute fixes as fees to be paid an attorney for an estate because not more than one-half of the work necessary to be done to earn such fee had been done at the time when the claimant terminated his connection with said estate as attorney for it."
The court found that claimant was discharged by the executrix, but it appears that claimant had filed his claim and had it allowed by the probate court before such discharge. Claimant died after the entry of the decree by the district court. The probate court erred in allowing the claim for the full amount of the statutory fee before claimant was discharged. Kirk v. Culley,202 Cal. 501, 261 P. 994. We considered the statutes involved here in Re Keel's Estate, 37 N.M. 569, 25 P.2d 806, and the Territorial court held in Johnston v. Board of Commissioners, 12 N.M. 237,78 P. 43, that the personal representative of an attorney who performs services under a contract for fees but died before full performance can recover only such reasonable proportion of the contract price as the services performed bears to the whole services contracted for, or, as otherwise stated, than the reasonable value of the services performed. *Page 353 
Appellee cites the case of Webb v. Trescony, 76 Cal. 621,18 P. 796, where it is said:
"Where an attorney at law is employed to defend a suit at an agreed compensation, and fully performs his agreement until discharged without cause, the measure of his damages is the compensation named in the contract."
Other cases supporting this doctrine are collected in the dissenting opinion in Lawler v. Dunn, 145 Minn. 281,176 N.W. 989.
Later decisions hold that the attorney is limited to recovery of the reasonable value of services rendered. Marquam v. Vachon (C.C.A.) 7 F.2d 607; Lawler v. Dunn, supra; Elconin v. Yalen,208 Cal. 546, 282 P. 791; Id. (Cal.App.) 280 P. 559. In the Marquam Case Judge Hunt, speaking for the court, said:
"A contract by which an attorney is employed is of a character which distinguishes it from most contracts of employment. The distinction has recently been commented upon in Martin v. Camp,219 N.Y. 170, 114 N.E. 46, L.R.A. 1917F, 402, where the New York Court of Appeals, after citing earlier cases in unanimous opinion, said:
"`These cases, and many others that might appropriately be cited to the same effect, establish that, while so far as the attorney is concerned the contract is entire, and the attorney cannot recover unless he completely performs, the client, with or without cause, may terminate the contract at any time. The substance of the rule declared in these cases was expressed by Judge Hiscock in Re Dunn, supra, 205 N.Y. 398, 98 N.E. 914, Ann. Cas. 1913E, 536. In that case it was said: "It is well established, in the case of the client, that he may at any time for any reason which seems satisfactory to him, however arbitrary, discharge his attorney."'
"The relationship of attorney and client rests upon such confidential and personal elements that it is wise that dissolution may be had at the will of the client, and the decisions go to the extent of holding that the right of the client to dismiss the attorney, whether with or without cause and at any time, is an implied condition of the contract of employment. 2 R.C.L. 957. Therefore dismissal of the attorney, arbitrarily or without cause, does not constitute a breach."
The author of the annotation following the decision in the Martin v. Camp Case in L.R.A. 1917F, at page 406, points out that the New York court limited its decision to a very narrow field, for it is stated that:
"What has been said declaratory of the rule that the attorney is limited to a recovery upon a quantum meruit does not relate to a case where the attorney in entering into such a contract has changed his position or incurred expense."
This case falls within the narrow field. In fact, it is still more limited *Page 354 
under the decision of the district court holding that the executrix is not personally responsible for the attorney's fees, and we are constrained to hold that the attorney's fees should be limited to the fair proportion of the statutory fee as the services performed bears to the whole services contracted to be performed.
The executrix further maintains that community property was classified in the inventory as separate property and asked the court to find:
"That at the time of the death of said testator all and every kind of property left by him, except the said Goat Ranch and except the goats grazing thereon, appraised at Two Thousand ($2,000.00) Dollars, and except the real estate composing the Fairview Cattle Ranch, which is particularly described in the appraisement, was the community property of said Frank H. Winston and Ella W. Winston."
This would reduce the separate estate, appraised at some sixty odd thousand dollars, to about $13,000 and would leave no funds available for the payment of certain legacies. The trial court, after hearing the executrix' witnesses, refused to make the finding.
We start with the presumption that the property having been acquired during marriage is community property. In re Faulkner's Estate, 35 N.M. 125, 290 P. 801. However, it is admitted that the deceased received the gifts listed in his will and that he invested them as therein stated. The main controversy is as to the cattle. The largest herd was on the "Fairview Cattle Ranch" listed in the will as separate property. These cattle were branded R bar R. The executrix testified:
"Mr. Winston bought the R bar R of the Liles and those cattle as I recall it were paid for with the first $10,000.00 that his father gave him before his death."
Another lot of cattle were branded K over K, classified as separate property in the will and therein referred to as follows:
"The same being under partido contract to L.D. Holderby."
The executrix' ranch foreman testified:
"Q. Were you familiar with the transaction between Mr. Winston and L.D. Holderby * * * by which in 1923 or prior thereto Holderby had taken certain cattle under partido contract to run? A. I am not familiar with it enough to explain it positively but in some way there was a deal between Mr. Holderby and Gus Welty and Ross Atkins and these cattle finally became the property of the Atkins and Winston partnership concern."
The executrix received the testator's share of this partnership property. There was much hearsay testimony offered with reference to these properties. It was agreed by all parties that the testator was a good business man, systematic and capable of keeping his accounts. The niece of the executrix, who had assisted with the books of accounts for seven or eight years before the death of testator, testified: *Page 355 
"Mr. Winston had an account for each separate business but the income from each business was deposited in the general banking account and used accordingly."
The deposit of the income from the several businesses in the same bank account does not necessarily mean the mingling of the community and separate property. Testator's books were in the possession of the executrix. Neither the books nor an audit of them was offered in evidence.
It would appear that the facts regarding the issue raised could have been ascertained definitely from these books. It appears from the evidence that the testator bought a half interest in a small mercantile business in a boom mining camp with borrowed capital in 1885; that he later acquired the other half of the business and prospered; that he acquired considerable real estate in Fairview; that he saw the boom mining camp become a ghost town; that he adjusted himself to the changed conditions and continued his mercantile business supplying the limited population of the vicinity, and when he received the gifts from his parents he branched out into the stock business and slowly through the years his flocks and herds increased.
The executrix testified:
"I have heard him say many times that it was five years that his store carried the ranch. * * *"
During the thirty odd years, there were no doubt unprofitable years for the ranchman, but on the whole the business seems to have been reasonably prosperous and during the long period between the receipt of the gifts and the death of the testator he more than doubled the capital given to him.
So far as we can judge from the record, the total annual sales of the store, much of which was made on credit and never collected, were about $15,000. Family expenses are prima facie presumed to have been paid from community funds, Title Ins. 
Trust Co. v. Ingersoll, 158 Cal. 474, 111 P. 360. The executrix testified:
"Yes sir, several times I would go east. Sometimes I would be gone a year at a time."
We may only speculate as to whether anything was left after the family expenses were deducted from the profits of the store. The district court was justified in refusing to make the requested findings.
The executrix excepted to the paragraph numbered 2 of the decree and maintains that under our statutes, Comp.St. 1929, § 47-604, the first and only time that the widow is called upon to assert her claim of interest in or ownership of property of her deceased husband, or the community property of both her deceased husband and herself, is when she files her final account as executrix and makes application for an order of distribution. This involves the effect of the widow's probating the will and filing an inventory classifying the property into community property *Page 356 
and separate property of the decedent in accordance with the will. She cites Andros v. Flournoy, 22 N.M. 582, 166 P. 1173, 4 A.L.R. 387, and other cases.
We had under consideration in Owens v. Andrews, 17 N.M. 597,131 P. 1004, 49 L.R.A.(N.S.) 1072, the question of what amounted to an election by the widow to take under or against a will, and there it was decided:
"Courts of equity have never laid down any rule determining for all cases what conduct shall amount to an implied election, but each case must depend in great measure upon its own circumstances.
"To raise an inference of election from the party's conduct merely, it must appear that he knew of his right to elect, and not merely of the instrument giving such right, and that he had full knowledge of all the facts concerning the properties." (Syllabi.)
The cases are collected in an annotation following Hahn et al. v. Dunn, 211 Iowa, 678, 234 N.W. 247, 82 A.L.R. 1503, annotation, 1509.
The executrix in the case at bar not only had the advice of claimant as to her rights, but consulted other able counsel a few months after she qualified as executrix. She took no step to attack the will nor moved to have the inventory amended, but, during the hearing in this case three years after the inventory was filed, testified that she had no intention of attacking the will and has not at any time done so. There is no plea of ignorance here.
The bank stock was acquired after the making of the will for some $10,000, and that investment had not only lost itself but some $20,000 more at the time of the hearing. This was classified as separate property, and, while community property is subject to the payment of the debts of the husband and the community (Strong v. Eakin, 11 N.M. 107, 66 P. 539), debts or obligations incurred for the benefit of the husband's separate estate, under a decree marshaling separate and community debts and property, should be paid out of the husband's separate property.
The claimant, who had acted as attorney for the testator and was familiar with several transactions by testator involving large sums, stated that he was confident that the bank investment was made with funds from the separate property, and in response to a letter from the executrix stating "it would be a fine point to determine how much money came from the store and how much came from the cattle ranch for recent investments such as bank stock, * * *" and wrote:
"I do not understand how Mrs. Winston can see any possible advantage in hunting for evidence so as to involve all the community property, that is, her own half, as well as the half willed her by Mr. Winston. As the matter stands, under the provisions of the will, it is to me perfectly plain that this is not a community *Page 357 
investment, but an investment of separate property; and hence this loss and future liability is chargeable against the separate property, and not the community property. But she cannot pick and choose between different investments and select for the community only those which appear to have some real value."
The other "recent investments" are of small value compared with the losses resulting from the ownership of the bank stock. The evidence submitted in support of the theory that the live stock was community property did not overcome the admission that the gifts were received and invested as stated in the will. The "rents, issues and profits" adhere to the separate estate under our statute, Comp.St. 1929, § 68-303. The evidence of mingling is not convincing. The statement by the executrix that the store carried the ranch for five years, considered in connection with the testimony of her niece that "Mr. Winston had an account for each separate business," merely indicates that the ranch was indebted to the store as it might have been to any other creditor. We are convinced that all the property classified as separate property in the inventory, except property acquired after the making of the will, was separate property and that the minor items of after-acquired assets, particularly the unspent salary as president of the bank and the money in the till of the store which might have been classified as community property, were more than offset by the conservative appraisement made at claimant's suggestion of large items of separate property, as found by the district court.
It is argued by the learned counsel for appellee that the classification in the inventory and appraisement was made upon the classification made in the will itself, said will containing the clearly expressed intention of the testator and a testamentary inventory as recognized under our statute, Comp.St. 1929, § 47-204, and that in order to set aside this testamentary inventory or classification the appellant must attack the will itself in a direct proceeding to impeach the statements therein contained. We have not considered this question nor the effect of our limitation statute on the widow's right to elect (although it is apparent that she was fully advised as to her right to elect during the year and that she had full knowledge of all the facts concerning the properties and would be estopped from attacking the will or inventory in a contest between her and a legatee whose legacy would be lost by such change in position on her part), believing that the question of whether or not the appraisement of the estate upon which the attorney's fee was calculated showed a higher value than the facts justified should be determined. We are convinced that the appraised value of decedent's testamentary property and estate was not greater than its actual value.
Ordinarily, the importance and results of the case are to be considered in determining the fee of an attorney, but where his advice is not followed he should not *Page 358 
be penalized because of resulting losses. A painstaking examination of the 262 pages of the record leaves us with the firm conviction that the findings of the district court as to the skill and professional standing of claimant were fully justified.
The decree will be reversed and the cause remanded to the district court for further proceedings in conformity with this opinion.
It is so ordered.
SADLER, C.J., and BICKLEY and ZINN, JJ., concur.
BRICE, J., did not participate.