# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-047

Filing Date: October 25, 2010

Docket Nos. 31,602/31,603

SUZANNE GUEST and THE
GUEST LAW FIRM, P.C.,

       Plaintiffs-Respondents/
       Plaintiffs-Petitioners,

v.

ALLSTATE INSURANCE COMPANY,

       Defendant-Petitioner/
       Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**James A. Hall, District Judge**

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Jennifer A. Noya
Albuquerque, NM

Kirkland & Ellis, L.L.P.
Richard C. Godfrey
Andrew A. Kassof
Chicago, IL

for Petitioner/Respondent
Tucker Law Firm, P.C.
Steven L. Tucker
Santa Fe, NM

The Guest Law Firm, P.C.
Suzanne Guest
Phoenix, AZ

for Respondents/Petitioners

## OPINION

**BOSSON, Justice.**

**{1}** A jury awarded Plaintiff Suzanne Guest, an attorney, a multi-million-dollar verdict against her former client, Defendant Allstate Insurance Co. The jury found that Allstate had breached its contract to defend and indemnify Guest in a lawsuit that was filed against her and Allstate by a former insured of Allstate. The bulk of Guest's $1,800,000 compensatory damages award was for ten years worth of future earnings that she claimed Allstate would have paid her in legal fees had it not breached the promise to defend and indemnify her. We affirm the Court of Appeals in holding that the trial court properly submitted the question of liability based on breach of contract to the jury.

**{2}** We are persuaded, however, that Guest's recovery of unearned attorney fees from her former client threatens the essential trust that lies at the core of any attorney-client relationship—a relationship which ethically is and must be terminable at the discretion of the client. We therefore overturn on public policy grounds the jury's award of future earnings. We also reverse the Court of Appeals holding that Allstate's promise to defend and indemnify Guest was not an insurance contract as defined by statute. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

**{3}** This dispute arose out of a 1997 car accident and subsequent attempt by an Allstate insured to collect on a modest uninsured motorist policy. Such humble beginnings sparked a round robin of vitriolic litigation culminating in this, the fifth written appellate opinion since 2007. *See Durham v. Guest*, 2009-NMSC-007, 145 N.M. 694, 204 P.3d 19; *Guest v. Allstate Ins. Co.*, 2009-NMCA-037, 145 N.M. 797, 205 P.3d 844; *Guest v. Berardinelli*, 2008-NMCA-144, 145 N.M. 186, 195 P.3d 353; *Durham v. Guest*, 2007-NMCA-144, 142 N.M. 817, 171 P.3d 756. We hope this will be the last word on the matter. We are not optimistic.

**{4}** Guest represented Allstate in the resulting dispute with Allstate's insureds, Jamie Deveney and Travis Durham (the Durhams), in their uninsured motorist claim against Allstate. At that time Guest, a private attorney, performed considerable legal work for Allstate and Allstate insureds that constituted a large percentage of her practice. The Durhams' claim eventually went to arbitration, where they were awarded $45,000 from Allstate—an amount $31,000 more than Allstate's highest offer. *See Durham v. Guest*, 2007-NMCA-144, ¶ 5.

**{5}** The Durhams then sued Allstate and Allstate's adjuster, alleging bad faith insurance practices, conspiracy, and fraud. These 2001 claims arose out of a set of internal policies and practices that Allstate had adopted, allegedly to enhance its corporate profits at the

2

expense of its insureds by denying or artificially limiting their claims. Through their attorney, David Berardinelli, the Durhams also took the unusual step of suing Guest for her role as Allstate's attorney in the arbitration proceedings, alleging violations of the New Mexico Insurance Code, aiding and abetting a violation of fiduciary duty, unjust enrichment, malicious abuse of process, malicious defense, and prima facie tort. *Guest v. Berardinelli*, 2008-NMCA-144, ¶ 3. Specifically, the Durhams accused Guest of

> malicious character assassination of the Durhams and of maliciously abusing process to obtain their employment and medical records outside the scope of discovery or in violation of protective orders with the intent to humiliate the Durhams, to cause or threaten them to lose their employment, to extort and intimidate them to give up their rights, and to retaliate against them for not accepting Allstate's settlement offer.

*Id.*

**{6}** In the fateful act that led to the litigation before us now, Guest demanded that Allstate provide her with a legal defense in the Durhams' lawsuit and with indemnification in the event of an award in Durhams' favor against her. Allstate agreed to defend Guest and provided her with an attorney, Stephen Simone, who proposed to file a motion to dismiss on her behalf. Simone explained to Guest that Allstate had decided to take the Durhams' claims to trial and had agreed to defend her through the conclusion of the matter. He further explained that Guest could choose to have Simone handle her motion to dismiss, or she could opt for separate counsel. Guest chose the latter option, and Allstate hired Stephen Royce to represent her against the Durhams.

**{7}** When Allstate notified Guest that Royce would be her attorney, it did so in a letter acknowledging its agreement to provide her with a defense but mentioning nothing about indemnification. Through Royce, Guest repeatedly requested written confirmation of Allstate's agreement to indemnify her, but Allstate did not respond. The indemnification question did not turn out to be pivotal, however, because the Durhams eventually dismissed their complaint, without prejudice, in late 2001.

**{8}** In early 2002, the Durhams filed a second lawsuit, echoing their original claims, but expanding the allegations against both Allstate and Guest. Guest renewed her demand for a defense and indemnification, but this time Allstate refused, suggesting instead that she seek coverage from her own professional liability insurer. Guest was "shocked" by Allstate's refusal; she viewed Allstate's promise to defend her as a contract, which was still binding because the new complaint was a continuation of the original lawsuit. Believing Allstate to have breached that contract, Guest became concerned that an ethical conflict was developing that would force her to refrain from accepting any additional legal work from Allstate. Allstate's referrals amounted to at least 85 percent of Guest's law practice.

3

**{9}**     Guest's professional liability insurer appointed counsel and began representing her against the Durhams.  Guest and her new attorney met with Simone and Allstate and demanded that Allstate honor its obligation to defend and indemnify her.  Allstate refused; Guest then returned all but two of her active cases to Allstate.  Guest believed that the two cases she retained had advanced so far that Allstate's insureds would suffer prejudice if she withdrew.  Guest also requested that Allstate refrain from sending her any new legal work for at least six months, so that she could evaluate whether she could continue to represent Allstate in the future.  Ten days later, Guest again demanded that Allstate honor its promise to defend and indemnify her, but received no response.

**{10}**     A few months later, the Durhams offered to dismiss the complaint against Guest with prejudice on the condition that Allstate waive its right to remove the case to federal court.  Allstate refused, though Simone had previously informed Guest that Allstate never intended to file for removal.  Guest testified at trial that Allstate's refusal to accommodate her dismissal from the *Durham* proceedings—based on "a false reason"—had undermined her trust in Allstate as a client and led her to conclude that she could never represent Allstate again.  By Thanksgiving 2002, Guest had completed all of her pending Allstate cases, closed her law practice, and moved to Phoenix, Arizona.  At about the same time, the trial court dismissed all of the Durhams' claims against her except the one for malicious abuse of process.

**{11}**     Shortly thereafter, in early 2003, Guest's professional liability insurer went into receivership, leaving her unrepresented.  Guest again demanded that Allstate honor its promise to defend and indemnify her, and this time Allstate agreed.  In a letter dated March 19, 2003, Allstate denied that it had previously abandoned its agreement to defend and indemnify her, but it agreed to do so now  because "the circumstances surrounding this case and [Guest's] request [were] unique."  That letter, containing the only written description of Allstate's agreement to defend and indemnify her, stated:  "Allstate is willing to provide to you a defense and indemnification.  Indemnification will not be provided for any ultra vires acts, which is consistent with the original defense provided to you."  Allstate gave Guest her choice of counsel, and again she selected Royce.

**{12}**     Throughout 2003 and early 2004, Guest, the Durhams, and the Durhams' attorneys, David Berardinelli and Cheryl McLean, engaged in increasingly hostile settlement negotiations regarding Guest's dismissal.  Early in 2003, Guest indicated that she was willing to agree to a zero-dollar, mutual release.  However, Guest later reversed her position because of "new allegations about some pretty horrendous things [Berardinelli] was claiming [she] did . . . ."  Guest felt that the new allegations went too far, and she decided that any settlement would be unacceptable if she were required to release the Durhams or Berardinelli from any future lawsuit she might bring against them.  "I simply said . . . that's it, I am . . . defending myself, the facts are coming out, the truth is coming out, and if it means it goes to the end, it goes to the end."

4

**{13}** One particular episode reveals the caustic tone of the negotiations as they evolved. In September 2003, the Durhams made a Rule 1-068 NMRA offer of settlement to Guest, seeking to dismiss their claims against her with prejudice for *no* money in return for a mutual release of liability and a confidentiality order. Guest responded in March 2004 with a letter describing the only conditions under which she would agree to release the Durhams and their attorneys: (1) the agreement must state that "there were insufficient facts to form a basis for the filing and continued pendency of the complaint," and (2) the Durhams and their attorneys must sign a $100 bill and present it to Guest along with a letter from the attorneys "acknowledging . . . that the $100 [was] inadequate compensation for the damages caused by the lawsuit and its allegations."

**{14}** The Durhams agreed to dismiss Guest with prejudice and pay her $100 in exchange for a mutual release, but they rejected any demand to confess guilt. Guest countered by offering to release only the Durhams if they admitted an absence of good cause for their complaint against her, signed a $100 bill, and gave her a letter explaining that the $100 was merely a symbolic gesture and not sufficient compensation for her damages. The Durhams refused.

**{15}** On March 19, 2004, two weeks after Guest's initial response to this offer of settlement, Allstate informed her that it would begin its own settlement negotiations with the Durhams. Allstate further informed Guest that it would cease funding her defense when it reached a settlement. Allstate explained that it had fully met its obligation to defend and indemnify her because the "Allstate funded defense . . . [had] successfully placed [her] in a position where she [could] be dismissed with prejudice from this lawsuit at no cost or future liability to her." In short, Allstate placed Guest on notice that, if she chose to continue the litigation beyond the date of a settlement agreement between Allstate and the Durhams, she would do so at her own expense.

**{16}** Early in August 2004, Allstate and the Durhams reached a tentative agreement, and Allstate informed Guest that a settlement was imminent. Allstate also reiterated that it intended to withdraw Guest's defense if she abstained from the agreement.

**{17}** In reply, Guest explained that Allstate's promise to defend and indemnify her was "unconditional." Specifically, "Allstate did not reserve any right[s] to control [her] defense," and "[n]o . . . conditions were placed that the defense provided was conditional on Allstate settling its portion of the case on terms agreeable to it." Therefore, Guest did not have to accept the zero-dollar, zero-liability offer of settlement because it required her to release "not only [the Durhams] personally, but also their counsel [Berardinelli], in fact, making that an absolute requirement to any resolution at that point." Guest concluded that she would view any withdrawal of her defense as a breach of Allstate's contract. Thereafter, she was unwavering in her refusal to join the settlement.

**{18}** By the end of August, Berardinelli informed Allstate that the Durhams would not

5

agree to the settlement because it was "unacceptable in a number of ways." He specifically cited (1) Allstate's continued funding of Guest's defense, and (2) Guest's refusal to release the Durhams' attorneys from liability for bringing suit. "Guest remains adamant in using this case as a springboard for continued litigation. Apparently, Allstate is willing to fund Guest's vendetta against counsel in this case." Berardinelli refused to agree to the settlement unless Guest agreed to participate. The negotiations had reached an impasse.

{19} By October 26, 2004, Allstate had made good on its threat and ceased funding Guest's defense. Without a funding source, Guest assumed the cost of her own defense and hired new attorneys.

{20} In November 2004, Allstate again invited Guest to join in a settlement with the Durhams and Berardinelli. In a statement, upon which Allstate relied heavily at oral arguments in this appeal, Allstate informed Guest that Berardinelli had "suggested . . . that he would not object to language" in a settlement agreement that would allow Guest to "preserv[e] her claim against the Durhams" and "not waiv[e] any claim she may have against Ms. McLean or Mr. Berardinelli."

{21} Allstate filed a motion to compel settlement, and the trial court held a hearing on the motion on January 28, 2005. At the hearing, Allstate asked the court to compel the Durhams to agree to the terms of a settlement proposal. Allstate clarified that the proposed settlement did not require a dismissal of the Durhams' remaining claim for malicious abuse of process against Guest and that Allstate did not "intend by [the] settlement to impair any of [Guest's] rights." Berardinelli made clear that he and the Durhams also wished to settle, but he expressed his concern that he did not think that a settlement releasing Allstate "as the principal" could leave intact any remaining claims against its agent, Guest. Berardinelli further clarified that he and the Durhams wanted to settle all the claims in the lawsuit, including those against Guest, and that they were willing to release Allstate and Guest from any further liability, this time without a reciprocal release from Guest of the Durhams or their attorneys.

{22} Guest responded that she did not wish to be a party to any settlement, regardless of its terms. She believed that she had been wronged, and what she wanted was "a finding either by the court or an admission by the Plaintiff through dismissal with prejudice that she should never have been named as a Defendant in this case." The hearing ended in a stalemate, with Guest refusing to settle, the Durhams refusing to dismiss her, and Allstate refusing to agree to pay for any potential judgment against her. The trial court refused to compel the settlement.

{23} Guest then filed the present lawsuit against Allstate for damages resulting from Allstate's breach of its contract to defend and indemnify her. Ultimately, the jury found Allstate liable for breach of contract, breach of its duty of good faith and fair dealing, and prima facie tort. As evidence of damages, Guest demonstrated at trial that she had incurred $73,873 in out-of-pocket expenses and legal fees while defending herself against the

Durhams and Berardinelli after Allstate's withdrawal. She estimated at trial that she would expend at least another $50,000 in appeals relating to the ongoing *Durham* litigation.

**{24}** Guest also put on evidence that she was entitled to a minimum of $2,500,000 in consequential damages for future earnings—$250,000 per year for ten years—based on what she likely would have earned if she had been able to continue to represent Allstate and its insureds during that time. Although it was Guest who had terminated the attorney-client relationship, she claimed at trial that, ethically, she was forced to withdraw because Allstate's breach had placed her in a hostile and incompatible relationship with her former client. After deliberations, the jury awarded Guest $1,842,900 in compensatory damages and $9,000,000 in punitive damages against Allstate. Based on due process grounds, the trial court thereafter reduced the punitive damages award to an amount equal to the compensatory damages award.

**{25}** On appeal, the Court of Appeals affirmed the verdict of liability but reversed the award of damages, holding that Guest could not recover any future, unearned fees because her employment relationship with Allstate was at-will. *Guest*, 2009-NMCA-037, ¶¶ 51, 56. The Court also affirmed the trial judge's finding that the contract to defend and indemnify Guest was not an insurance contract and, therefore, Guest was not entitled to recover attorney fees incurred in the pursuit of the present action. *Id.* ¶¶ 59, 63. The Court of Appeals remanded for a new trial on damages, noting that due process requires an award of punitive damages to be reasonably related to an award of compensatory damages which now had been substantially reduced. *Id.* ¶ 58.

**{26}** We granted both parties' separate petitions for writ of certiorari, 2009-NMCERT-004, 146 N.M. 641, 642, 213 P.3d 791, 792, and address the issues raised in both petitions in this consolidated Opinion.

**DISCUSSION**

**The verdict of liability for breach of contract is affirmed.**

**{27}** Allstate no longer disputes the existence of its contract to defend and indemnify Guest. Instead, Allstate contends that it fully performed its obligations to Guest and, therefore, "the Court of Appeals erred as a matter of law by failing to dismiss or reject Guest's contract claim." (Emphasis omitted.) Specifically, Allstate argues that, as a matter of law, (1) it discharged its obligations under the contract when it negotiated a "no cost, full release settlement" on Guest's behalf; (2) Guest cannot sue for breach of a contract when she obstructed its performance; and (3) the Court of Appeals' interpretation of the defense and indemnification agreement is against public policy. We address each argument in turn.

***Allstate did not satisfy all of its contractual obligations by negotiating a "no cost, full release settlement."***

7

**{28}** Allstate renews the argument it made to the Court of Appeals that it fully satisfied its obligations under the contract when it negotiated a "no cost, full release settlement" on Guest's behalf. *See Guest*, 2009-NMCA-037, ¶ 26. Allstate claims that it "discharged its obligation by negotiating a settlement which Guest would not agree to." *Id.*

**{29}** In response, Guest contends that she had a right to reject Allstate's offer, and Allstate could not compel her to acquiesce. Guest claims that the "proposed settlement . . . was unacceptable to [her] because, among other reasons, it failed to protect her from the enormous damage caused by the allegations and conduct of the Durhams and their counsel, and it required her to release her claims against the Durhams, their counsel, and Allstate." Without her consent to the proposed settlement, Allstate was obliged to continue with her defense and indemnification.

**{30}** In support of its argument, Allstate relies heavily on *Teigen v. Jelco of Wisconsin, Inc.*, 367 N.W.2d 806, 810 (Wis. 1985), for the proposition that once an insurer negotiates a settlement, "[it] has discharged . . . its obligation to [the] insured, . . . carried out the terms of its contract, . . . fully protected itself and its insured from further exposure, and, therefore, . . . has no further contractual duty to defend." *Teigen*, and the other authorities cited in Allstate's brief, maintains that "absent an express provision to the contrary, an insurer is free to settle a case *despite* an insured's request not to do so," 367 N.W.2d at 810, and that "[o]nce [an] insurer extinguishes the underlying liability, it discharges its duty to defend," *Aetna Cas. & Sur. Co. v. Coronet Ins. Co.*, 358 N.E.2d 914, 919 (Ill. App. Ct. 1976).

**{31}** For the reasons that follow, Allstate's position does not persuade us. Ultimately, as Guest argues in her answer brief, Allstate's cited authority "do[es] not stand for the proposition for which [it is] cited." *See also Guest*, 2009-NMCA-037, ¶¶ 26-27. The authorities cited by Allstate rely on particular language in the contracts at issue to determine the scope of the insurer's duty; they do not explore the conditions under which an insurer satisfies its contractual obligations in an open-ended contract to defend and indemnify. Those authorities stand for the proposition that, in the context of defense and indemnification, the terms of the particular contract control the extent of the indemnitor's obligation, an unremarkable proposition at best.

**{32}** In *Teigen*, for example, the Wisconsin Supreme Court focused on language in the insurance contract which specifically stated that the insurer "shall not be obligated 'to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.'" *Teigen*, 367 N.W.2d at 810 (emphasis omitted); *see also Aetna Cas. & Sur. Co.*, 358 N.E.2d at 919 (focusing on policy limits as defined in the automobile liability insurance contract to determine the exposure of the insurer). The presence of this contractual language makes *Teigen* inapposite to the present case, in which Allstate simply agreed "to provide to [Guest] a defense and indemnification" without any further elaboration or condition.

**{33}** We adhere to the rule that, absent contractual language to the contrary, an agreement

8

to defend and indemnify extends to the conclusion of the litigation. *See* Steven Plitt et al., *Insurer's Duty to Defend: Nature, Commencement, and Termination, in* 14 *Couch on Insurance 3d* § 200:47 (Supp. 2007) ("Generally, an insurer's duty to defend arises out of a potentially covered claim and lasts until the conclusion of the underlying lawsuit, or until it has been shown that there is no potential for coverage. When multiple alternative causes of action are stated, the duty continues until every covered claim is eliminated." (footnotes omitted)); § 200:49 ("An insurer's duty to defend continues until final resolution of the covered claims. In other words, the duty to defend continues through the appellate process until it can be concluded as a matter of law that there is no basis on which the insurer may be obligated to indemnify the insured." (footnote omitted)).

**{34}** Without clear authority for its position, Allstate essentially asks this Court to *imply* a term to the contract that would make it more like a formal policy for liability insurance, thereby limiting Allstate's obligation to Guest. We are no more willing to imply a right to settle without Guest's consent than we would be to imply any other term limiting Allstate's obligation to her, such as a policy limit or a punitive damages exemption to the contract. For whatever reason, Allstate placed no limits or conditions on its promise to defend and indemnify Guest, and we will not do so after the fact.

**{35}** We find Allstate's position on this issue particularly troublesome given Guest's repeated requests for written confirmation of Allstate's agreement to defend and indemnify her. When Allstate finally did so, it missed the opportunity to define the parameters of its responsibilities. Allstate did not reserve a right to settle the Durhams' claims against Guest without her consent, nor did it define the terms under which its contractual obligations would be satisfied. In other words, Allstate—a sophisticated party in the realm of defense and indemnification—has no one to blame but itself for the situation it now faces. Absent evidence of express contractual language to the contrary, Allstate's obligations to Guest extend through the end of the litigation—whether as a result of a final judgment or a settlement that is acceptable to Guest.

### Whether Guest obstructed performance of the contract was for the jury to decide.

**{36}** Allstate next argues that Guest's unreasonable behavior obstructed the performance of its contract. *See Nat'l Old Line Ins. Co. v. Brown*, 107 N.M. 482, 487, 760 P.2d 775, 780 (1988) ("He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned; * * * the party thus prevented from discharging his part of the obligation is to be treated as though he had performed it." (quoting *Gibbs v. Whelan*, 56 N.M. 38, 42-43, 239 P.2d 727, 730 (1952))).

**{37}** Responding, Guest quotes from the Court of Appeals' opinion in this case that she "did not prevent Allstate from fulfilling its duty to defend." *Guest*, 2009-NMCA-037, ¶ 28. She argues that she was "fully within her rights" in choosing not to agree to a settlement that would have forced her to release her claims against the Durhams, Berardinelli, and Allstate.

**{38}** Allstate relies upon this Court's Opinion in *Gibbs*. In that case, the plaintiff resigned from a steady job after the defendant contacted him and offered him a salaried position for at least five years doing field work on an as-needed basis. *Gibbs*, 56 N.M. at 40, 239 P.2d at 728-29. The plaintiff made himself available to work whenever necessary and performed all work that the defendant asked of him. *Id.* On many occasions, however, the plaintiff did not work at all because the defendant had not lined up any work for him. *Id.* Eventually, the plaintiff sued to recover unpaid wages, and the trial court ruled in his favor. *Id.* at 40-41, 239 P.2d at 728-29. On appeal, this Court affirmed, explaining, "The defendant having voluntarily failed to line up work for the plaintiff to perform, he will not be permitted to deny liability under their agreement." *Id.* at 42, 239 P.2d at 730. When a party—the plaintiff in *Gibbs*—is "prevented from discharging his part of [the] obligation, [he] is to be treated as though he had performed it." *Id.* at 42-43, 239 P.2d at 730 (internal quotation marks and citation omitted). But Allstate cannot justify identifying itself with the plaintiff in *Gibbs*.

**{39}** Unlike the defendant in *Gibbs*, Guest did not prevent Allstate from performing its obligations under the contract. Allstate promised to defend and indemnify Guest, and we agree with the Court of Appeals that "Allstate could have satisfied its contract with Guest by representing her." *Guest*, 2009-NMCA-037, ¶ 28. Furthermore, as we explain later in this Opinion, the trial court ruled that a fact question existed as to the intended meaning of the terms "defend and indemnify," which the jury answered in Guest's favor. Consequently, we cannot rule as a matter of law that Guest's refusal to settle prevented Allstate from continuing to provide a defense and indemnification. Had Allstate specified in the contract that it could satisfy its promise to Guest by negotiating a settlement, *Gibbs* might support its argument. Absent such contractual language, however, we disagree that, as a matter of law, Guest obstructed performance of the contract.

**{40}** At oral argument, Allstate raised a slightly different, but related, contention, suggesting that this Court should bar Guest's recovery, not because she prevented Allstate's performance, but because her refusal to settle was in bad faith and unreasonable as a matter of law. As evidence, Allstate argued that Guest's outrageous demand for a signed $100 bill (1) could have resulted in disciplinary sanctions against her and (2) demonstrated that her refusal to settle was motivated solely by her desire to pursue a personal vendetta against the Durhams and Berardinelli. To affirm the verdict, Allstate argues, would condone Guest's behavior and "encourage litigation for litigation's sake."

**{41}** To the extent this issue was raised at trial or in the briefing for this appeal, we agree with the trial court that Guest's reasonableness in refusing to settle was ultimately for the jury to decide. In response to Allstate's motion for summary judgment, the trial court held that Guest had created a fact question as to the meaning of the terms "defend and indemnify" as set forth in the contract, which Allstate does not question on appeal. Specifically, at trial Allstate argued that its promise to "defend and indemnify" Guest was limited to protecting her from liability. Guest, on the other hand, claimed that she understood the contract to be a broader promise to defend her from *harm*.

10

**{42}** We agree with the trial court. Because of a factual dispute concerning the definition of these critical terms, Guest's reasonableness under the contract could only be evaluated in light of the evidence of what the parties intended those terms to mean. *See C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509, 817 P.2d 238, 243 (1991) ("The question of interpretation of language and conduct (the question of the meaning to be given the words of the contract) is a question of fact where that meaning depends on reasonable but conflicting inferences to be drawn from events occurring or circumstances existing before, during, or after negotiation of the contract."). After hearing the evidence and being properly instructed, the jury decided this issue in Guest's favor. Regardless of whether Guest's conduct may have been sanctionable—a question far beyond the scope of this appeal—the reasonableness of her conduct was properly submitted to the jury under the circumstances of this case.

### *Public policy does not require reversal on liability.*

**{43}** In its last argument for reversal, Allstate asserts that a ruling in Guest's favor violates public policy. Allstate argues that affirming the verdict would be contrary to the venerable principle that New Mexico law favors the settlement of lawsuits. Specifically, a ruling in Guest's favor will create "an interminable and untenable indemnity obligation" (emphasis omitted) and "grant[] an indemnitee the right to unreasonably drag its indemnitor into a quagmire of protracted litigation."

**{44}** We have often repeated the notion that the law favors settlement of cases. *See, e.g.*, *Bogle v. Potter*, 68 N.M. 239, 246, 360 P.2d 650, 655 (1961). Such a general statement of policy, however, is of little help to Allstate here. Unless Guest acted in bad faith—a conclusion rejected by the jury—Allstate is obligated to perform under a contract in which it retained no unilateral authority to withdraw its defense before the end of the litigation.

**{45}** Allstate also urges reversal because this Court, being responsible for drafting and enforcing the rules of professional responsibility for the state's legal profession, should not reward "vexatious litigation and 'shocking' settlement demands." We acknowledge that aspects of the settlement negotiations were highly unorthodox, and we do not condone Guest's behavior in this lawsuit. However, this case is not before us as a disciplinary matter. The jury evaluated the conduct of both parties, and in the jury's eyes Allstate—not Guest—came up wanting. Allstate does not question the jury's verdict in this appeal, and we reject Allstate's invitation to transform this proceeding into a referendum on Guest's behavior.

### **Having proven liability, Guest nonetheless may not recover unearned attorney fees.**

**{46}** The Court of Appeals held that Guest could not recover future earnings as a matter of law because her relationship with Allstate was at-will. Inasmuch as the Court of Appeals' opinion could be read to preclude future earnings resulting from *any* at-will relationship, we agree with Guest that the Court may have spoken too broadly. However, limited to the facts

11

of this case, where an attorney is suing her former client and seeking damages for legal work not performed, we agree with the Court of Appeals that Guest's future earnings are not recoverable.  *See Guest*, 2009-NMCA-037, ¶ 56 ("We hold that, *based on the specific circumstances presented by this case*, future wages or earnings that might have arisen from the relationship that was terminable at will are not recoverable." (emphasis added)).

### *Attorneys may recover only for services actually rendered.*

**{47}**     Nearly a century ago, this Court stated, "[t]he relation of attorney and client is one of the highest trust and confidence, requiring the attorney to observe the utmost good faith towards his client, and not to allow his private interests to conflict with those of his client." *In re Barth*, 26 N.M. 93, 126, 189 P. 499, 510 (1920).  Ever mindful that worldly pressures and changing conditions may obscure or erode this ideal, this Court, acting as the sole arbiter of a self-governing profession, must ensure that we do not lose sight of every attorney's essential function:  to provide competent, diligent, and loyal representation to every client. *See* Rule 16-101 NMRA; Rule 16-103 NMRA; Rule 16-107 NMRA committee cmt. [1]. These values are our lifeblood, critical to our professional survival.  Without them, we put at risk the trust and respect of the public and of our clients—past, present, and future.

**{48}**     At the foundation of every attorney-client relationship is the client's unqualified right to discharge an attorney at any time, with or without cause.  Rule 16-116 NMRA committee cmt. [4]; *see also* 23 Richard A. Lord, *Williston on Contracts* § 62:6, at 301-02 (2002) ("Most courts have consistently held that the right of the client to dismiss an attorney is an absolute and essential incident to the attorney-client relationship, since the association is predicated upon mutual trust and respect.  This right is unconditional, and may be exercised at any time, whether or not there is just cause for the dismissal." (footnote omitted)).  As the Supreme Court of Minnesota aptly explained, a client

> should not be forced against his will to employ an attorney upon whose judgment he does not wish to depend and whose advice he feels he cannot follow with confidence.  Since the relationship of attorney and client is a confidential one, it must of necessity be based on mutual trust. Forcing such [a] relationship upon the client against his will would not be conducive to an atmosphere of reciprocal confidence.

*State ex rel. Seifert, Johnson & Hand v. Smith*, 110 N.W.2d 159, 167 (Minn. 1961); *see also* Rule 16-107 committee cmt. [1] ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."); Rule 16-106 NMRA committee cmt. [4] ("[T]rust . . . is the hallmark of the client-lawyer relationship.").

**{49}**     A necessary corollary of the client's power to discharge an attorney at any time is the general rule that an attorney may collect fees only for services actually rendered, either under contract or principles of quantum meruit.  *See* 1 Robert L. Rossi, *Attorney's Fees*

§ 3:10, at 3-26 (3d ed. 2002) ("The clear trend, in both fixed-fee and contingency fee cases, is to not allow recovery for the contract price but rather to generally limit the recovery of an attorney discharged without cause to the reasonable value of the services rendered prior to discharge."); *see also, e.g.*, *Olsen & Brown v. City of Englewood*, 889 P.2d 673, 677 (Colo. 1995) (holding that an attorney discharged without cause is entitled only to quantum meruit and may not recover fees for services not rendered); *Clegg v. USAgencies Ins. Co.*, 985 So. 2d 781, 784 (La. Ct. App. 2008) (where attorney was not given the work that was promised, he is only entitled to receive compensation for work actually performed); *cf. In re Winston's Will*, 40 N.M. 348, 354, 59 P.2d 904, 907 (1936) (limiting recovery of discharged attorney to "the fair proportion of the statutory fee as the services performed bears to the whole services contracted to be performed").

**{50}** This rule holds true in a variety of circumstances, irrespective of the reasons for terminating the attorney-client relationship. *See, e.g.*, *Calderon v. Navarette*, 111 N.M. 1, 2, 800 P.2d 1058, 1059 (1990) ("As a general rule an attorney may recover the reasonable value of services rendered under a void contract. However, recovery is grounded on a quantum meruit theory, not on the terms of the voided contract."); *see also United States v. 36.06 Acres of Land*, 70 F. Supp. 2d 1272, 1276-77 (D.N.M. 1999) (barring full recovery of contingency fee and otherwise limiting recovery to quantum meruit after attorney withdrew from representation); *Cato v. Ark. Mun. League Mun. Health Benefit Fund*, 688 S.W.2d 720, 723-24 (Ark. 1985) (holding that an attorney was entitled to quantum meruit after the client settled without the attorney's knowledge); *Ambrose v. Detroit Edison Co.*, 237 N.W.2d 520, 524 (Mich. Ct. App. 1975) (holding that an attorney working under a contingency-fee agreement was entitled only to quantum meruit for work already done when dismissed); *Wilson v. Brooklyn Trust Co.*, 24 N.Y.S.2d 161, 161 (App. Term 1940) (holding that an attorney may recover the value of his services rendered up to the time of the client's death).

**{51}** Similarly, our Rules of Professional Conduct require an attorney to return any unearned portion of a retainer when an attorney-client relationship has been terminated. Rule 16-116(D) ("Upon termination of representation, a lawyer shall . . . refund[] any advance payment of fee or expense that has not been earned . . . ."); *see also In re Yalkut*, 2008-NMSC-009, ¶ 26, 143 N.M. 387, 176 P.3d 1119 (per curiam) ("[A] flat fee for future legal services cannot be considered as earned when paid and must be held in trust until earned."). While there are some exceptions to the general rule, especially concerning in-house counsel serving under an employment contract, they are not relevant here. *See, e.g.*, *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 861-62 (Tenn. 2002) (holding that an attorney acting as in-house counsel to a corporation may recover damages (e.g. unearned wages) for retaliatory discharge).

**{52}** Holding a client liable for work *not* performed undermines the trust essential to the attorney-client relationship. Although no New Mexico cases are on point, courts in other jurisdictions have relied on this principle in refusing to allow attorneys to collect unearned fees from their clients. For example, in *Olsen & Brown v. City of Englewood*, 889 P.2d 673, 677 (Colo. 1995) (en banc), the Colorado Supreme Court held that a discharged attorney

13

could not recover fees for work that he was promised but that he never performed. The court noted that as an attorney, the plaintiff owed the highest fiduciary duty to his client; if the attorney were allowed to collect an unearned fee, the client, in effect, would be punished for exercising its right to terminate. *Id.* at 675-77; *see also Clegg*, 985 So. 2d at 784 (denying recovery of fees for work not performed because "an attorney may not force his continued representation [on] a client" (alteration in original) (internal quotation marks and citation omitted)).

**{53}** Guest argues that these cases and authorities are inapposite because they uniformly involve an attorney suing a client for breach of the professional services contract itself, whereas she is suing for breach of a contract for insurance, not employment. Guest did not sue Allstate for wrongfully discharging her; she sued Allstate for breach of Allstate's contract to defend and indemnify her, an obligation independent of her former retention as Allstate's attorney. According to Guest, all the evidence presented at trial demonstrates that, but for Allstate's breach, she would have continued working for Allstate indefinitely. She was happy representing Allstate, and Allstate was satisfied with her performance. Allstate even tried to send her new cases after this lawsuit was pending, which Guest—not Allstate—put an end to. Consequently, Guest insists that she is entitled to the fees she would have earned from Allstate far into the future—ten years as claimed at trial—had Allstate not breached its contract to defend and indemnify her.

**{54}** We acknowledge that Guest's argument has some force. In another context, we might consider whether an employee in an at-will relationship (other than an attorney-client relationship) may recover future earnings for breach of a collateral agreement with the employer. However, we are not willing to allow recovery where the underlying relationship is between an attorney and her client, especially where the collateral agreement bears some relationship to her employment.

**{55}** The nature of the attorney-client relationship demands that the client retain the power to discharge the attorney at any time. As a corollary, we agree with the corresponding rule that an attorney's damages must be limited to quantum meruit for services actually rendered, not damages for services anticipated but never provided. To permit Guest to recover unearned fees from Allstate would set a dangerous precedent, potentially conditioning or encumbering a client's absolute right to discharge an attorney. In our judgment, such a result could tarnish the legal profession. This is too high a price for our profession to pay, no matter how deserving Guest's position might have appeared to the jury in this case.

**{56}** To be clear, we are not announcing a rule that categorically precludes an attorney from recovering future earnings under any circumstances. For example, a victim of personal injury who happens to be an attorney might sue the tortfeasor for damages that include lost earnings, a claim upon which we state no opinion herein. We hold only that under circumstances such as these, where a contract arising out of the attorney-client employment relationship gives rise to a claim for breach that effectively negates the continued viability of that relationship, the attorney cannot recover fees for unearned services.

14

**{57}** Guest argues in the alternative that an award of future earnings may be predicated on her separate claims for prima facie tort and breach of the duty of good faith and fair dealing. Because these claims arose out of the same circumstances as her contract claim—her employment relationship with Allstate—our reasoning applies regardless of the theory of liability.[1]

**{58}** Turning to the damages in this case, the only evidence supporting the jury's $1,842,900 compensatory award was Guest's estimate of her future earnings—which we hold are barred as a matter of law—and the cost of defending herself in the underlying *Durham* lawsuit, which we leave unaltered in this Opinion. At trial, Guest did not present evidence of any outstanding fees that Allstate owed to her for work already performed. Consequently, we limit Guest's compensatory damages to the amount supported by the evidence for out-of-pocket expenses that Guest incurred in defending herself in the *Durham* lawsuit up to the time of the trial in this case: a total of $73,873. We add to that figure Guest's projection of the total cost of her future appeals related to the *Durham* litigation in the amount of $50,000.

**The contract to defend and indemnify Guest is an insurance contract.**

**{59}** In her final point of appeal, Guest argues that the Court of Appeals erred in holding that her defense and indemnification agreement with Allstate is not an insurance contract. She asks this Court to hold as a matter of law that the agreement meets the statutory definition of insurance and to remand the case so that she can present argument and evidence that she is entitled to attorney fees under statute or the common law. *See* NMSA 1978, § 39-2-1 (1977) ("In any action where an insured prevails against an insurer who has not paid a claim on any type of first party coverage, the insured person may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim."); § 59A-16-30(B) (1990) (allowing the trial court to award attorneys fees for a willful violation of the Unfair Insurance Practices Act); *see also Lieber v. ITT Hartford Ins. Ctr., Inc.*, 15 P.3d 1030, 1037 (Utah 2000) (stating that under Utah common law, "[a]ttorney fees may be awarded where a breach of the implied covenant of good faith and fair dealing, inherent in every insurance contract, has occurred").

**{60}** Guest asserts that the contract in this case fits New Mexico's statutory definition of insurance. *See* NMSA 1978, § 59A-1-5 (1984) ("'Insurance' is a contract whereby one

---

[1]Guest also briefed and argued several issues related to our caselaw concerning the availability of consequential damages in a claim for breach of contract, including the continued viability of the so-called "tacit agreement" rule of foreseeability discussed by the Court of Appeals in this case. *Guest*, 2009-NMCA-037, ¶ 53; *see also Camino Real Mobile Home Park P'ship v. Wolfe*, 119 N.M. 436, 446, 891 P.2d 1190, 1200 (1995) (adopting the "tacit agreement" rule of foreseeability). We do not reach these arguments because we decide this matter on other grounds.

undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies, or to act as surety."). She maintains that the Court of Appeals wrongly held that the contract in this case is not an insurance contract by "grafting" several requirements onto the definition of insurance that were not included by the Legislature. *See Guest*, 2009-NMCA-037, ¶¶ 61-63 (holding that the contract is not an insurance contract because it does not involve risk distribution or unequal bargaining power). We agree that the Court of Appeals strayed too far from the statutory definition in its analysis.

**{61}** We first note that the prior definition of insurance, dating back to 1925, *see* 1925 N.M. Laws, ch. 135, § 1, was somewhat circular and formalistic, *see* NMSA 1978, § 59-1-1 (1925, as amended through 1984) (defining "insurance" as "any form of insurance, bond or indemnity contract, the issuance of which is legal in the state of New Mexico"). If the current statute continued to define insurance, more or less, as insurance, we might agree with the Court of Appeals' analysis, which looked to the common law for those features historically used to determine whether a particular contract is a contract of insurance. *See Guest*, 2009-NMCA-037, ¶¶ 60-63.

**{62}** But the current definition, adopted by the Legislature as part of the Insurance Code in 1984, articulates a functional approach, looking to the substance of the contract rather than to its label. *See* § 59A-1-5. The Legislature directed and focused our inquiry by specifying the controlling aspects of a contract that make it one of insurance. This definition makes no mention of risk distribution, risk sharing, or unequal bargaining power, the traditional features of insurance on which the Court of Appeals relied to determine that the contract in this case was not an insurance contract. *See Guest*, 2009-NMCA-037, ¶¶ 60-63. Rather, for this contract to be one of insurance, the definition simply requires that Allstate agreed to "indemnify [Guest] as to loss from certain specified contingencies or perils." Section 59A-1-5. That is precisely what Allstate agreed to do—to pay a judgment if the Durhams prevailed in their claims against Guest.

**{63}** Allstate argues, however, that the statutory definition of insurance, if applied literally, would encompass an array of contracts which are not ordinarily considered to be insurance according to the commonly understood meaning of the term. *See* 1 Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance, 2d* § 1.3, at 16 (1996) ("In most states where 'insurance' (or the term 'contract of insurance') is defined by statute, the definitions are usually brief, cryptic and unsatisfactory. . . . . Such overbroad definitions are not useful and may cause many commercial relationships erroneously to constitute insurance."). We agree with Allstate in principle. To characterize as insurance every contract that contains an indemnity agreement of some sort would bring a multitude of everyday commercial contracts under the purview of the Insurance Code, NMSA 1978, §§ 59A-1-1 to 59A-59-4 (1984, as amended), and obligate the parties to comply with a host of statutory requirements and regulations. *See, e.g.*, § 59A-5-10 (requiring any person who "transact[s] insurance" to obtain a certificate of authority from the superintendent of insurance). We agree that the

Legislature did not intend such an overly broad result. Consequently, we will look beyond the plain language of the statute to clarify its intended scope.

**{64}** As evidenced by our insurance statute, the concept of indemnity is central to any definition, but a promise to indemnify, by itself, is not enough. *See* 1 Steven Plitt et al., *Couch on Insurance 3d* § 1:7, at 1-19 (rev. ed. 2009) ("While a policy of insurance . . . is essentially a contract of indemnity, not all contracts of indemnity are insurance contracts; rather, an insurance contract is merely one type of indemnity contract."). For example, we recently considered an indemnity provision buried in the fine print of an equipment rental contract to determine whether the promise of indemnity was void as against public policy. *See United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶¶ 1, 8, ___ N.M. ___, ___ P.3d ___ (holding that an equipment rental contract is a construction contract such that the indemnity provision was unenforceable). Experience teaches that this kind of indemnity clause is common in the commercial setting and is often a boiler-plate feature of a contract of adhesion. Not even Guest argues that such a provision, clearly incidental to the primary aim of the contract, should subject the parties to the rigors of the Insurance Code. *See Castleberry v. Goldome Credit Corp.*, 418 F.3d 1267, 1273 (11th Cir. 2005) ("When assumption of risk is only collateral to a contract that has a principal purpose other than risk shifting, the contract is not a contract of insurance.").

**{65}** Our own caselaw provides an appropriate limiting principle to what would otherwise be an overly inclusive definition of insurance. In *New Mexico Life Insurance Guaranty Ass'n v. Moore*, 93 N.M. 47, 48, 596 P.2d 260, 261 (1979), this Court was asked to determine if a group of health maintenance organizations (HMOs) were "engaged in 'health insurance' so as to subject them to New Mexico's Life Insurance Guaranty Act." *Moore* held that the HMOs were not insurers under the Guaranty Act because their "'principal object and purpose'" was to provide member-paid services—not to provide indemnity. 93 N.M. at 50-51, 596 P.2d at 263-64.

**{66}** The "principal object and purpose" test was first announced in *Jordan v. Group Health Ass'n*, 107 F.2d 239 (D.C. Cir. 1939), and as in *Moore* the test was used to determine whether a group health plan was insurance or a service contract. The test directs a court to consider "not . . . whether risk is involved or assumed, but . . . whether that or something else to which it is related in the particular plan is its *principal object and purpose*.'" *Id.* at 248 (emphasis added). This approach has been followed in several other jurisdictions to determine whether particular contracts constitute insurance. *See, e.g.*, *Truta v. Avis Rent A Car Sys., Inc.*, 238 Cal. Rptr. 806, 812-13 (Ct. App. 1987) (holding that the collision damage waiver provision in an automobile rental contract did not constitute insurance because the principal object and purpose of the contract was automobile rental), *superseded by statute as stated in Schnall v. Hertz Corp.*, 93 Cal. Rptr. 2d 439 (Ct. App. 2000)); *Kinkaid v. John Morrell & Co.*, 321 F. Supp. 2d 1090, 1100 (N.D. Iowa 2004) (holding that a provision in a contract for the sale of hogs deducting a small percentage of the sale price in exchange for the assumption of the risk of the death of the hogs after their purchase was not insurance because the provision was incidental to the primary object and purpose of the contract);

*Allen v. Burnet Realty, LLC*, 784 N.W.2d 84, 89 (Minn. Ct. App. 2010) (holding that an indemnification plan offered by a realty company to its associates was not insurance because it was merely part of a contract that had the principal object and purpose of selling real estate).

**{67}** As one treatise explains the application of the test, "[i]n the final analysis, many analysts will . . . ask one question: What is the principal object of the contract? Is it indemnity, or is it something else? If the principal object of the contract is indemnity, the contract constitutes 'insurance' and is therefore within the scope of state regulation." Robert H. Jerry, II, 1 *New Appleman on Insurance Law Library Edition* § 1.03[3][b], at 1-27 to -28 (Jeffery E. Thomas & Francis J. Mootz, III eds., 2009). We find this analysis persuasive—especially given the emphasis on indemnity in our statutory definition of insurance.

**{68}** We are persuaded that this contract between Allstate and Guest is the type that the Legislature intended to characterize as insurance, even though, as Allstate points out, it lacks an insurance contract's formal characteristic of adhesion and its components of paid premiums, a formal policy, and issued claims. When Allstate agreed to defend and indemnify Guest, it clearly assumed the risk of her losses resulting from the *Durham* lawsuit. More importantly, the promise to defend and indemnify her was not a collateral agreement intended to induce Guest to enter into a larger contract with Allstate. Guest's defense and indemnification was the exclusive purpose of the contract. This contract meets our statutory definition of insurance because its "principal object and purpose" is to indemnify Guest in the event of an adverse judgment in the *Durham* litigation.

**{69}** Under these circumstances—where the *only* purpose of this agreement was to shift Guest's risk to Allstate in the event she became liable to the Durhams—we believe that the Legislature intended its definition of insurance to apply literally. When an entity such as Allstate—no stranger to the requirements of the Insurance Code—enters into an agreement with the sole purpose of assuming the risk of another party, it is providing insurance.

**{70}** We do not decide whether Guest is actually entitled to attorney fees because that issue is not properly before us. We only hold that the contract in this case is an insurance contract, and we remand to the trial court to consider whether Guest's legal theories for the recovery of her fees have merit and to consider the evidence accordingly.

**{71}** As a final matter, Allstate does not challenge and we do not disturb the jury's finding that Guest is entitled to punitive damages. The sole remaining issues for the trial court on remand are whether Guest should recover her legal fees and whether Guest's punitive damages award is constitutionally reasonable given the reduction of her compensatory damages in this appeal. We consider all other issues raised on appeal to be resolved by this Opinion.

**CONCLUSION**

**{72}** We affirm the Court of Appeals with respect to Allstate's liability for breach of contract, and we affirm on other grounds its denial of Guest's unearned fees. We reverse the Court of Appeals' ruling that the agreement to defend and indemnify Guest is not an insurance contract and remand the matter to the trial court for proceedings consistent with this opinion.

**{73}** **IT IS SO ORDERED**.

 

_____
                      **RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Justice (dissenting)**

**PATRICIO M. SERNA, Justice (joining dissent)**

**CHÁVEZ, Justice, dissenting.**

**{74}** It is undisputed that Allstate obtained the Durhams' offer to dismiss Guest from the lawsuit with prejudice, without her having to contribute a single penny, and without compromising whatever claim(s) Guest believed she had against the Durhams and their attorneys. Having secured this promise, there simply was nothing more for Allstate to defend against or indemnify but for the additional undisputed fact that Guest refused to accept the Durhams' offer. Because Allstate reasonably fulfilled its gratuitous promise to Guest, I respectfully dissent.

**{75}** The sum total of Allstate's gratuitous promise to Guest was as follows: "Allstate is willing to provide to you a defense and indemnification. Indemnification will not be provided for any ultra vires acts, which is consistent with the original defense provided to you." The majority acknowledges that this promise was not a policy of insurance, a premium was not paid, a formal claim on a policy was not made, and this was not a contract of adhesion. Majority op. ¶ 67. However, despite clear evidence that this was an isolated, case specific promise to indemnify, made after the lawsuit was filed, the majority concludes the promise was an insurance contract allowing Guest to pursue attorney fees under Utah common law[2] or the following statutes.

_____

[2]If Utah common law is relevant, then perhaps we should analyze what constitutes an insurance contract under Utah law. However, I fail to see how Utah common law is at

*See* NMSA 1978, § 39-2-1 (1977) ("In any action where an insured prevails against an insurer who has not paid a claim on any type of first party coverage, the insured person may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim."); § 59A-16-30(B) (1990) (allowing the trial court to award attorney's fees for a willful violation of the Unfair Insurance Practices Act); *see also Lieber v. ITT Hartford Ins. Center, Inc.*, 15 P.3d 1030, 1037 (Utah 2000) (stating that under Utah common law, "[a]ttorney fees may be awarded where a breach of the implied covenant of good faith and fair dealing, inherent in every insurance contract, has occurred").

Majority op. ¶ 58. I agree with the Court of Appeals' logical conclusion, based on its reasonable risk distribution analysis, that the promise was not an insurance contract. *See Guest v. Allstate Ins. Co.*, 2009-NMCA-037, ¶¶ 59-65, 145 N.M. 797, 205 P.3d 844. In addition, it seems clear from reading the Insurance Code as a whole that the Legislature was contemplating more than an isolated indemnification agreement in defining "insurance contract." Reference is made to insurance policies throughout the Insurance Code. *See, e.g.*, NMSA 1978, § 59A-16-20 (1984) (amended 1994); NMSA 1978, § 59A-18-2 (1984); NMSA 1978, § 59A-19-1 (1984); and other statutory citations too numerous to list. NMSA 1978, Section 39-2-1 (1977) refers to first party coverages. NMSA 1978, Section 59A-16-30 (1990) limits itself to Article 16 insurance policies and practices.

**{76}** Even more disquieting than the majority's conclusion that Allstate's gratuitous promise to indemnify is an insurance contract is, having labeled it an insurance contract, the majority refuses to interpret the promise using reasonable insurance contract principles. For example, regarding a duty to settle under an insurance contract, we have stated that "[a] liability insurance company has a duty to timely investigate and fairly evaluate the claim against its insured, and to accept reasonable settlement offers within policy limits." UJI 13-1704 NMRA. When discussing a good-faith obligation to settle, we have said that "good faith does impose upon the insurer the duty to settle whenever practicable." *Dairyland Ins. Co. v. Herman*, 1998-NMSC-005, ¶ 13, 124 N.M. 624, 954 P.2d 56. "The insurer's good-faith evaluation of the costs and benefits of settlement is generally accorded deference." *Id.* ¶ 14. It seems clear from our precedent that if a claimant makes a reasonable offer which allows the insurer to eliminate any risk that the insured will have to pay money out of his or her own pocket, the insurance company must accept the offer and pay it. *Id.* ¶¶ 14, 15. We have also made it clear that "[t]he obligation to deal fairly and honestly rests equally upon the insurer and the insured." *Modisette v. Found. Reserve Ins. Co.*, 77 N.M. 661, 666, 427

---

all relevant. In New Mexico we follow the American rule, which provides that, in the absence of statute, court rule, or contractual agreement, the prevailing party will not normally receive attorney fees. *New Mexico Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, 127 N.M. 654, 986 P.2d 450; *Schroeder v. Mem'l Med. Ctr.*, 1997-NMSC-046, ¶ 6, 123 N.M. 719, 945 P.2d 449. Guest does not claim that she is entitled to attorney fees based on contract or court rule.

P.2d 21, 25 (1967).

**{77}**     Instead of incorporating these well-established principles into what they conclude is an insurance contract, the majority gives Allstate's gratuitous promise the most expansive interpretation imaginable. Under the majority analysis, Allstate's isolated promise to indemnify means that Allstate has to win on the merits at all costs, and if it fails to win after exhausting all trial and appellate court arguments, it must pay all damages, attorney fees, and costs on Guest's behalf. I do not agree with this broad interpretation of Allstate's gratuitous promise because it is unreasonable and antithetical to the aforementioned New Mexico insurance jurisprudence. Allstate should have been able to conclude the litigation as long as Guest did not have to pay any money or give up her potential claim against the Durhams and their attorneys. This is precisely what would have happened except for the fact that Guest obstructed the settlement.

**{78}**     Allstate's attorney sent a letter dated November 19, 2004 to Guest's attorney, Faith Reyes. The letter reads:

> Dear Ms. Reyes:
>
> I received a telephone call from David Berardinelli concerning settlement of this matter. Mr. Berardinelli stated that he would have no objection to including Suzanne Guest on the form of release that I had originally prepared. Enclosed please find a copy of my draft settlement agreement and release of all claims which I had originally forwarded to Mr. Berardinelli months ago. I could insert Suzanne Guest into this document as a released party and also add a sentence that no money is being paid on her behalf.
>
> Mr. Berardinelli suggested that in the form of the motion and order of dismissal of these claims, that he would not object to language whereby Suzanne Guest is preserving her claim against the Durhams and is not waiving any claim that she may have against Ms. McLean or Mr. Berardinelli.
>
> Does Suzanne want to be a part of this release? I had previously made this proposal to Mr. Royce which was rejected. Does Suzanne want to reconsider?
>
> Please let me know as soon as possible her position.

**{79}**     These terms were stated on the record during a January 28, 2005 hearing to compel settlement. Although Guest continued to refuse to be included in the settlement, Berardinelli acknowledged that, for all practical purposes, if he dismissed Allstate, he was dismissing their agent. While he discussed the possibility of keeping his claim against Guest alive, months earlier he agreed to release her. As he explained to the judge:

> My clients want this case over with. They are willing to accept the

$35,000 as full payment of all their claims against Allstate and its agents. My real problem is that I don't think we can settle with Allstate as the principal, and not effectively release all of the agents who are acting within the course and scope of their duties for Allstate in the course of this action. And I brought that up with Mr. Simone [Allstate's lawyer], and I told him - - we had gone back and forth and back and forth on a form of release. I finally told him, "Mr. Simone, I really don't think there's any effective way for us to save our claims against Suzanne Guest, not that we want to, if we're giving you a full and complete release for everything that you're responsible for either derivatively or directly. Therefore, we want to dismiss this case pursuant to the settlement."

Along with dismissing the lawsuit against both Allstate and Guest, Berardinelli made clear both his and his client's willingness to stipulate that Guest "did not pay any monies, and we're not asking her for a release." Seemingly baffled by Guest's refusal to settle under these terms, the court inquired of her attorney how it is that Guest is prejudiced "if she doesn't have to sign a release." In response, Guest's attorney stated, "The point is, Judge, that she was brought in as a Defendant to this case. She does not want to be a part of the settlement. She can either be dismissed with prejudice, or we can continue this litigation and file - -."

{80}     The judge followed up with this question: "But isn't the reason she doesn't want to be part of a settlement because she'd be concerned that that would take away her right to sue? And I think what the Plaintiffs are saying is no." At this point, the reason for Guest's refusal to settle was stated by her lawyer. "Not solely, Judge, not solely. Yes, she wants a right to sue. She also wants a judgment of this Court dismissing her with prejudice on the merits; not because she's a party to a settlement." Exasperated, the court finally denied the motion to compel the settlement, stating "I don't think you've got a settlement. It's just too crazy - - well, I won't comment any further."

{81}     Allstate clearly positioned the case to eliminate any risk that Guest would have to (1) pay any money out of her pocket as a result of the pending litigation, or (2) give up her potential lawsuit against the plaintiffs and their attorneys. The proposed release and the order dismissing the case against Guest with prejudice would have included specific language noting that Guest did not pay any money for the settlement and no money was being paid on her behalf. The release also would have contained specific language stating that the claims were disputed and that Guest was not admitting liability. Securing a dismissal of the case against Guest, with prejudice, without her having to pay a single penny, with a statement that she did not contribute to the settlement and the settlement was not an admission of any liability, but still preserving her right to sue was a masterful fulfillment of Allstate's promise to defend and indemnify. It should be clearly noted that Allstate made a gratuitous promise to defend and indemnify Guest, not a promise to prosecute Guest's claim against the Durhams and their attorneys. Guest remained at liberty to sue for what she thought was a clear liability case against the Durhams and their attorneys. She could have pursued her lawsuit without exposing herself to liability or Allstate to additional liability and unnecessary expense.

22

**{82}**  Guest's reference, during the January hearing, to a Rule 1-041 NMRA dismissal with prejudice on the merits, must have been a reference to a Rule 1-041(B) dismissal.  Under this provision, assuming the action is tried to the court without a jury, after the plaintiff rests, the defendant may seek a dismissal of the case on the ground that the plaintiff is not entitled to relief based on the evidence and law.  In this case, Allstate could not guarantee a victory on the merits.

**{83}**  Guest obstructed Allstate from performing its obligation and should not be able to sue claiming breach.  *See Nat'l Old Line Ins. Co. v. Brown*, 107 N.M. 482, 487, 760 P.2d 775, 780 (1988).  A party to a contract who prevents the performance by the other party to the contract may not sue for breach of performance.  *Smith v. McKee*, 116 N.M. 34, 37, 859 P.2d 1061, 1064 (1993).  These are important principles overlooked in the majority Opinion. I would find for Allstate as a matter of law.

**{84}**  For the foregoing reasons, I respectfully dissent.

_____
**EDWARD L. CHÁVEZ, Justice**

**I CONCUR:**

_____
**PATRICIO M. SERNA, Justice**

**Topic Index for *Guest v. Allstate Ins. Co.,* Docket Nos. 31,602 and 31,603**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-RM | Remand |
| | |
| **AT** | **ATTORNEYS** |
| AT-CI | Conflict of Interest |
| AT-FG | Fees, General |
| AT-FU | Fees, Unearned |
| | |
| **CN** | **CONTRACTS** |
| CN-BR | Breach |
| CN-DD | Duty to Defend |
| CN-ID | Indemnification Agreement |
| | |
| **IN** | **INSURANCE** |
| IN-BF | Bad Faith |
| IN-DD | Duty to Defend |
| IN-IC | Insurance Contract |
| IN-IY | Indemnity |
| IN-SE | Settlement |

**RE**                      **REMEDIES**
RE-CD              Compensatory Damages
RE-ID               Indemnification
RE-PU              Punitive Damages

**ST**                      **STATUTES**
ST-IP               Interpretation